## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Mount Nittany Health System,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Blue Cross Blue Shield Association, Capital Blue Cross, Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania, Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., its subsidiary or division Independence Blue Cross, and QCC Insurance Company,<br><br>　　　　Defendants. | Electronically Filed<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Case No. <u>4:25-CV-549</u> |

This 26th day of March, 2025.

Brian J. Bluth
McCORMICK LAW FIRM
835 West Fourth Street
Williamsport, PA 17701

Joseph Ostoyich, *pro hac vice forthcoming*
William Lavery, *pro hac vice forthcoming*
Jordan Passmore, *pro hac vice forthcoming*
Sung Shin, *pro hac vice forthcoming*
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, DC 20006

*Attorneys for Mount Nittany Health System*

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................3

II.  JURISDICTION AND VENUE ..................................................7

III. INTERSTATE COMMERCE.....................................................9

IV.  THE PARTIES...........................................................................10
    A.   PLAINTIFF ......................................................................10
    B.   DEFENDANTS AND CO-CONSPIRATORS.................12

V.   RELEVANT MARKETS..........................................................38

VI.  FACTUAL ALLEGATIONS....................................................46
    A.   OVERVIEW OF THE INDUSTRY .................................46
    B.   HISTORY OF THE BLUE CROSS AND BLUE SHIELD SYSTEM
         ........................................................................................60

    1.   BEFORE THE LONG-TERM BUSINESS STRATEGY ................61

    2.   THE LONG-TERM BUSINESS STRATEGY AND ASSEMBLY OF
    PLANS ........................................................................................68

    3.   DEFENDANT    AND    CO-CONSPIRATOR    INSURANCE
    COMPANIES ENTER INTO UNLAWFUL AGREEMENTS .................76

    4.   THE BLUE CARD AND NATIONAL ACCOUNTS PROGRAMS ..
         ........................................................................................89

    5.   PROTECTING AND INCREASING "DIFFERENTIALS"............98

    6.   DIFFERENCES  BETWEEN  MODERN  BLUES  AND  OTHER
    INSURERS ............................................................................101

    C.   THE BCBS MARKET ALLOCATION CONSPIRACY...............103
    1.   RESTRICTING COMPETITION IN PENNSYLVANIA .............104

    2.   RESTRICTING COMPETITION IN OHIO ..................................110

    3.   RESTRICTING COMPETITION IN MARYLAND .....................113

    D.   IMPROPER   USE   OF   TRADEMARKS   TO   RESTRICT
         COMPETITION FOR PROVIDERS.............................................115
    E.   THE BCBS PRICE FIXING AND BOYCOTT CONSPIRACY...118

F.      OTHER ABUSES THAT PRESERVE THE BLUES' ENHANCED MARKET POWER ........................................................... 127

G.      ANTITRUST INJURY ................................................. 129

H.      DEFENDANTS AND CO-CONSPIRATORS, EVEN THOSE ORGANIZED AS NOT FOR PROFIT, ENJOY SUPRA-COMPETITIVE PROFIT ............................................... 133

**VII. TOLLING OF THE STATUTE OF LIMITATIONS** .......................... 137

**VIII. VIOLATIONS ALLEGED** ................................................. 138

**IX.  RELIEF REQUESTED** ..................................................... 144

## I.    INTRODUCTION

1.    For decades, Defendants and Co-Conspirators (collectively, "**Defendant and Co-Conspirator Insurance Companies**" or "**Blues**," and each, individually, "**Defendant or Co-Conspirator Insurance Company**" or "**Blue**") colluded to restrict competition for the purchase of healthcare services. As a result, healthcare providers, including Plaintiff, were paid much less than they would have been paid in a competitive market. Defendants' and Co-Conspirators' collusion violated federal antitrust laws.

2.    Plaintiff seeks damages and other relief caused by Defendants' continuing conspiracy to allocate territories, to restrict output, to fix prices, and to allocate customers in violation of Sections 1 and 3 of the Sherman Act, (15 U.S.C. §§ 1, 3) and causing damages under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15, 26).

3.    The Blues provide health insurance coverage for over 100 million—or one in three—Americans.

4.    Each Defendant or Co-Conspirator Insurance Company has agreed with each other Defendant or Co-Conspirator Insurance Company and with the Blue Cross Blue Shield Association (the "**Association**") not to contract with healthcare providers, including Plaintiff, outside of each Defendant or Co-Conspirator Insurance Company's allocated geographic area and to fix prices paid to healthcare providers, including Plaintiff.

5.    Defendant and Co-Conspirator Insurance Companies conspired to implement output-reducing restraints on each other Defendant or Co-Conspirator Insurance Company's ability to compete for the purchase of healthcare services. Among other restrictive output-reducing agreements, the Defendant and Co-Conspirator Insurance Companies and Association agreed to adhere to (1) a National Best Efforts Rule, which precludes each Defendant from earning more than 33% of its revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark, and (2) a Local Best Efforts Rule, which requires that 80% of the revenue received by a Defendant or Co-Conspirator Insurance Company from within an Exclusive Service Area comes from the sale of services using a Blue Cross and/or Blue Shield mark. The effect of these restraints is to ban or otherwise frustrate all competition for the purchase of healthcare services among Defendant and Co-Conspirator Insurance Companies.

6.    Commercial health insurers compete to attract purchasers of health insurance (or health insurance plan administration services, whether individuals, organizations, employers, or other plan sponsors). Commercial health insurers

differentiate themselves to potential customers by having a large network of healthcare services providers. To ensure a broad network offering to potential customers, insurers enter into contracts with healthcare providers. These contracted healthcare providers are referred to as "participating" or "in-network" providers.

7.    In a competitive market, health insurers would compete for the purchase (and contracting) of healthcare services from providers and would pay market rates for healthcare services. If, for example, an insurer offers or pays below the market price for healthcare services, then providers would be unwilling to remain, or contract to become, "in-network" with that insurer. As a consequence, insurers would be unable to offer a provider network as broad as its competitors' networks. Defendants' and Co-Conspirators' anticompetitive conduct restricts competition for providers of healthcare services.

8.    The Defendant and Co-Conspirator Insurance Companies' anticompetitive agreements distinguish them from other large commercial insurers. If an insurer wants to establish a provider network, then a value proposition an insurer can offer to a provider includes its ability to steer enrollees to that provider. A provider considering leaving the network appreciates the consequence of treating fewer of providers' enrollees. Each Defendant or Co-Conspirator Insurance Company, on the other hand, brings not only its own enrollees, but also the enrollees of every other Defendant or Co-Conspirator Insurance Company into negotiations with providers. A provider considering

leaving the local Defendant or Co-Conspirator Insurance Company's network knows that decision would cause it to lose the ability to treat local enrollees on an in-network basis *and* the ability to treat all Defendant and Co-Conspirator Insurance Companies' enrollees on an in-network basis. The Defendant and Co-Conspirator Insurance Companies use this leverage against providers.

9.     Defendant and Co-Conspirator Insurance Companies have agreed they will not compete, negotiate price terms, or contract with healthcare providers outside of their respective geographic territories. This agreed-upon constraint applies even when Defendant and Co-Conspirator Insurance Companies have significant enrollees in another's territory.

10.    If a healthcare provider treats a patient covered by a Defendant or Co-Conspirator Insurance Company in another state, then the healthcare provider must submit its claim for payment to the local Blue, which transmits it to the out-of-state Blue for processing. The provider is paid based on the reimbursement rates in its contract with the local Blue—thereby fixing prices between the local Blue and the out-of-state Blue. Defendants and Co-Conspirators refer to this arrangement as the Blue Card Program.

11.    The national programs including the Blue Card Program lock in fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its service area and makes those subcompetitive rates available to all other Defendant and Co-Conspirator Insurance Companies.

12. Defendant and Co-Conspirator Insurance Companies have also agreed not to contract with providers outside of their service area. This ensures a provider's only option for providing services to patients insured by Defendant and Co-Conspirator Insurance Companies outside its service area is through the local Defendant or Co-Conspirator Insurance Company, using the Blue Card Program. Providers are therefore forced to accept the local Defendant or Co-Conspirator Insurance Company's reimbursement rates when it provides healthcare services to any patients insured by any of the Defendant and Co-Conspirator Insurance Companies, regardless of what those insurers' rates are.

13. Defendants' and Co-Conspirators' anticompetitive conduct caused Plaintiff to be paid substantially less than it would have been paid in a competitive market for healthcare services.

## II. JURISDICTION AND VENUE

14. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiff brings its claims under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, and injunctive relief against the Defendants for the harm caused by Defendants' and Co-Conspirators' violations of §§ 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

15. This Court has personal jurisdiction over each Defendant pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) and/or the Pennsylvania long-arm statute (42 Pa. C.S. § 5322), because:

a. The Association, the principal member of the accused conspiracy, does business in this District; contracts with other members of the conspiracy that operated in this District, coordinates the transfer of funds to and from members of the conspiracy in this District, which funds constitute a measure of the alleged underpayment; and enforces or threatens to enforce the alleged anticompetitive agreement that furthers the harm suffered by Plaintiff in this District;

b. Defendant Insurance Companies engage in commerce in this District by operating in this District, by contracting with Plaintiff in this District, by providing health insurance coverage for Defendant and Co-Conspirator Insurance Companies' covered members located in this District, and by transmitting funds for services received by each Defendant or Co-Conspirator Insurance Company's covered members to and for the benefit of providers in this District, including Plaintiff, which funds constitute a measure of the alleged underpayment;

c. Plaintiff has a substantial presence within this District, and each of the Defendants and Co-Conspirators have adhered to and enforced an illegal agreement designed to cause harm to Plaintiff within this District, including a joint agreement not to contract with Plaintiff for the purchase of healthcare services;

d. Defendant or Co-Conspirator Insurance Companies have received material amounts of funds derived from or in connection with the accused conspiracy in this District;

e. Each Defendant has purposefully availed itself of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the Commonwealth of Pennsylvania) because each Defendant committed intentional acts that were intended to cause and did cause injury within this District; and/or

f. Defendants have purposefully availed themselves of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the Commonwealth of Pennsylvania) because Defendants transact business within this District by processing and/or paying healthcare claims for services provided within this District.

16.    Venue is also proper in this District pursuant to §§ 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and 28 U.S.C. § 1391.

## III.    INTERSTATE COMMERCE

17.    The activities of Defendants and Co-Conspirators that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

18.    The national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program are involved in interstate commerce and transaction for healthcare services.

19.    Plaintiff has used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

## IV.    THE PARTIES

### A.    PLAINTIFF

20.    Mount Nittany Health System d/b/a Mount Nittany Health ("**Mount Nittany**") is a Pennsylvania non-profit corporation with its principal place of business in State College, Pennsylvania, and is the exclusive owner by express assignment of all antitrust claims arising from injuries caused by Defendants' and Co-Conspirators' misconduct as alleged herein to all subsidiaries and affiliates, including Mount Nittany Medical Center, Mount Nittany Medical Center Health Services, Inc. d/b/a Mount Nittany Physician Group, Mount Nittany Health Ventures, The Foundation for Mount Nittany Medical Center d/b/a Mount Nittany Health Foundation, and Centre County Children's Advocacy Center. Mount Nittany is a community health system serving patients throughout Central Pennsylvania.

21.    Mount Nittany employed healthcare providers and provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant and Co-Conspirator Insurance Companies and was paid less for the healthcare services rendered than it would have been paid in a competitive market free from Defendants' and Co-Conspirators' agreements not to compete.

22.    Mount Nittany has been damaged by Defendants' and Co-Conspirators' conduct and has a right to bring these claims.

23.    Mount Nittany has sustained antitrust injury.

24.    Mount Nittany submitted a valid and timely exclusion request and is not a member of the Settlement Class. *See* December 4, 2025 Memorandum Opinion and Order Preliminarily Approving Provider Plaintiffs' Settlement and Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator at 51-52 (ECF No. 3225), *In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406) (Master File No. 2:13-CV-20000-RDP N.D. Ala.). The "Settlement Class" includes all Providers in the U.S. (other than Excluded Providers) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan from July 24, 2008 to October 4, 2024. "Provider" means any person or entity that provides healthcare services in the United States, including but not limited to a physician, group practice, or facility. "Excluded Providers" are (i) Providers owned or employed by any of the Settling Defendants; (ii) Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs; (iii) Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that

were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.); or (iv) Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance. Any Provider that falls within the exclusion(s) set forth in clauses (i), (ii) or (iv) of this paragraph for only a portion of the Settlement Class Period is a Settlement Class Member that may recover in the Settlement.

## B.    DEFENDANTS AND CO-CONSPIRATORS

25.    Defendant Blue Cross and Blue Shield Association (the "**Association**") is a not-for-profit corporation organized under the laws of the State of Illinois and headquartered in Chicago, Illinois. The Association was created and maintained by these companies in furtherance of their unlawful conspiracy under the guise of licensing themselves the marks that they claim were previously used by them.

26.    The principal headquarters for the Association is located at 225 North Michigan Avenue, Chicago, IL 60601.

27.    The Association has contacts with all 50 states, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the individual Defendant and Co-Conspirator Insurance Companies. The Association has entered into agreements with Defendant and Co-Conspirator Insurance

Companies that control the geographic areas in which the individual Defendant and Co-Conspirator Insurance Companies can compete. These agreements and resulting conspiracy restrict output and allocate the market contracting with healthcare providers on a nationwide basis in violation of §§ 1 and 3 of the Sherman Act.

28.    Defendant Capital Blue Cross ("**Capital**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in central Pennsylvania, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as the 21 counties that make up central Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

29.    The principal headquarters for Capital is located at 2500 Elmerton Avenue, Harrisburg, Pennsylvania 17177.

30.    Defendant Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield, and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania ("**Highmark-PA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and Blue Shield trademarks and trade names throughout the entire Commonwealth of

Pennsylvania. Highmark-PA is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.

31. The principal headquarters for Highmark-PA is located at 120 Fifth Avenue Place, Pittsburgh, Pennsylvania 15222.

32. Defendant Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., its subsidiary or division, Independence Blue Cross, and QCC Insurance Company Independence (together, "**Independence Blue Cross**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Southeastern Pennsylvania, where it is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the five counties that make up Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

33. The principal headquarters for Independence Blue Cross is located at 1901 Market Street, Philadelphia, Pennsylvania 19103.

34. Co-Conspirator Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue

Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "**Anthem-CA**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in California where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

35.    The principal headquarters for Anthem-CA is located at 21215 Burbank Blvd., Woodland Hills, California 91367.

36.    Co-Conspirator Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("**Anthem-CO**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Colorado where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

37.    The principal headquarters for Anthem-CO is located at 700 Broadway, Denver, Colorado 80203.

38.    Co-Conspirator Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("**Anthem-CT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Connecticut where it, like many other Defendant and Co-Conspirator Insurance

Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

39.    The principal headquarters for Anthem-CT is located at 370 Bassett Road, North Haven, Connecticut 06473.

40.    Co-Conspirator Anthem HealthChoice Assurance, Inc. d/b/a Anthem Blue Cross f/k/a Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("**Anthem-Empire**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

41.    The principal headquarters for Anthem-Empire is located at One Liberty Plaza, New York, New York 10006.

42.    Co-Conspirator Blue Cross Blue Shield of Georgia ("**Anthem-GA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Georgia where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

43.    The principal headquarters for Anthem-GA is located at 3350 Peachtree Road NE, Atlanta, Georgia 30326.

44.    Co-Conspirator Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana ("**Anthem-IN**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Indiana where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

45.    The principal headquarters for Anthem-IN is located at 120 Monument Circle, Indianapolis, Indiana 46204.

46.    Co-Conspirator Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("**Anthem-KY**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kentucky where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

47.    The principal headquarters for Anthem-KY is located at 13550 Triton Park Blvd., Louisville, Kentucky 40223.

48.    Co-Conspirator Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("**Anthem-ME**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maine where it, like many other Defendant and Co-Conspirator

Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

49.    The principal headquarters for Anthem-ME is located at 2 Gannett Drive, South Portland, Maine 04016.

50.    Co-Conspirator Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc. (together, "**Anthem-MO**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and Northwest Missouri. Anthem-MO is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the State of Missouri, except the 32 counties in greater Kansas City and Northwest Missouri.

51.    The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St. Louis, Missouri 63103.

52.    Co-Conspirator Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("**Anthem-NH**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Hampshire where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

53.     The principal headquarters for Anthem-NH is located at 3000 Goffs Falls Rd, Manchester, New Hampshire 03103.

54.     Co-Conspirator Anthem Blue Cross Blue Shield of Nevada (“**Anthem-NV**”) has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nevada where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

55.     The principal headquarters for Anthem-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, Nevada 89148.

56.     Co-Conspirator Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio (“**Anthem-OH**”) has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Ohio where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

57.     The principal headquarters for Anthem-OH is located at 120 Monument Circle, Indianapolis, Indiana 46203.

58.     Co-Conspirator Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross Blue Shield of Virginia (“**Anthem-VA**”) has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs. Anthem-VA is the largest

health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the State of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

59.    The principal headquarters for Anthem-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, Virginia 23230.

60.    Co-Conspirator Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "**Anthem-Wisconsin**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wisconsin where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

61.    The principal headquarters for Anthem-WI is located at 120 Monument Circle, Indianapolis, Indiana 46204.

62.    Co-Conspirator Elevance Health, Inc. ("**Elevance**") is the parent company of the Anthem-CA, Anthem-CO, Anthem-CT, Anthem-GA, Anthem-IN, Anthem-KY, Anthem-ME, Anthem-MO, Anthem-NV, Anthem-NH, Anthem-Empire, Anthem-OH, Anthem-VA, and Anthem-WI. Through its subsidiaries, Elevance has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin, where it is the largest or

one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

63.    The principal headquarters for Elevance is located at 220 Virginia Avenue, Indianapolis, Indiana 46204.

64.    Co-Conspirator Aware Integrated and BCBSM, Inc., d/b/a Blue Cross Blue Shield of Minnesota ("**Aware**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Minnesota where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

65.    The principal headquarters for Aware is located at 3535 Blue Cross Road, St. Paul, Minnesota 55164.

66.    Co-Conspirator Blue Cross and Blue Shield of Alabama ("**BCBS-AL**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the State of Alabama where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

67.    The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244.

68.    Co-Conspirator Blue Cross and Blue Shield of Arizona ("**BCBS-AZ**") has agreed to and participates in the Blue conspiracy using Blue Cross and

Blue Shield trademarks and trade names in Arizona where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

69.    The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, Arizona 85021.

70.    Co-Conspirator Blue Cross and Blue Shield of Kansas City, Inc. ("**BCBS-KC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte Counties in Kansas. BCBS-KC is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte Counties in Kansas.

71.    The principal headquarters for BCBS-KC is located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.

72.    Co-Conspirator Blue Cross and Blue Shield of Kansas, Inc. ("**BCBS-KS**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kansas where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

73.    The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.

74.    Co-Conspirator Blue Cross and Blue Shield of Massachusetts ("**BCBS-MA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Massachusetts where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

75.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, Massachusetts 02215.

76.    Co-Conspirator Blue Cross Blue Shield of Michigan Mutual Insurance Company ("**BCBS-MI**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Michigan where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

77.    The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

78.    Co-Conspirator Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company ("**BCBS-MS**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Mississippi where it, like many other Defendant and Co-Conspirator Insurance

Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

79.   The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, Mississippi 39232.

80.   Co-Conspirator Blue Cross and Blue Shield of North Carolina ("**BCBS-NC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Carolina where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

81.   The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, North Carolina 27707.

82.   Co-Conspirator Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("**BCBS-NJ**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Jersey where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

83.   The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, New Jersey 07105.

84.   Co-Conspirator Blue Cross and Blue Shield of Rhode Island ("**BCBS-RI**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Rhode Island where it, like

many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

85.    The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, Rhode Island 02903.

86.    Co-Conspirator Blue Cross and Blue Shield of South Carolina ("**BCBS-SC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Carolina where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

87.    The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, South Carolina 29212.

88.    Co-Conspirator Blue Cross Blue Shield of Tennessee, Inc. ("**BCBS-TN**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Tennessee where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

89.    The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402.

90.    Co-Conspirator Blue Cross and Blue Shield of Vermont ("**BCBS-VT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Vermont where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

91.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, Vermont 05602.

92.    Co-Conspirator Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York ("**BCBS-Western New York**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western New York, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as Western New York State.

93.    The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, New York 14202.

94.    Co-Conspirator Blue Cross and Blue Shield of Wyoming ("**BCBS-WY**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wyoming, where it is one of the

largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

95.    The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, Wyoming 82003.

96.    Co-Conspirator California Physicians' Service, d/b/a Blue Shield of California ("**California Physicians' Service**") has agreed to and participates in the Blue conspiracy using the Blue Shield trademark and trade name in California, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

97.    The principal headquarters for California Physicians' Service is located at 50 Beale Street, San Francisco, California 94105-1808.

98.    Co-Conspirator Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence BlueShield of Idaho ("**Cambia-ID**") has agreed to and participates in the Blue conspiracy using the Blue Shield trademark and trade name in Idaho, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

99.    The principal headquarters for Cambia-ID is located at 1602 21st Ave, Lewiston, Idaho 83501.

100.    Co-Conspirator Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence Blue Cross Blue Shield of Oregon ("**Cambia-OR**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oregon where it, like many other

Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

101.   The principal headquarters for Cambia-OR is located at 100 SW Market Street, Portland, Oregon 97207.

102.   Co-Conspirator Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence Blue Cross of Utah ("**Cambia-UT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Utah, where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

103.   The principal headquarters for Cambia-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, Utah 84121.

104.   Co-Conspirator Cambia Health Solutions, Inc. and its affiliates and/or assumed name Regence Blue Shield of Washington ("**Cambia-WA**") has agreed to and participates in the Blue conspiracy using Blue Shield trademarks and trade names in Washington, where it one of the largest health insurers, as measured by number of subscribers, within its allocated area.

105.   The principal headquarters for Cambia-WA is located at 1800 Ninth Avenue, Seattle, Washington 98111.

106.   Co-Conspirator CareFirst, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst Blue Choice, Inc. (together, "**CareFirst-DC**") has

agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

107.   The principal headquarters for CareFirst-DC is located at 10455 Mill Run Circle, Owings Mill, Maryland 21117.

108.   Co-Conspirator CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst Blue Choice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "**CareFirst-MD**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maryland where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

109.   The principal headquarters for CareFirst-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.

110.   Co-Conspirator Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (together, "**Excellus**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield

trademarks and trade names in central New York, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as 31 counties in central New York.

111.   The principal headquarters for Excellus is located at 165 Court Street, Rochester, New York 14647.

112.   Co-Conspirator GoodLife Partners, Inc. and Blue Cross Blue Shield of Nebraska ("**GoodLife**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nebraska where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

113.   The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha, Nebraska 68180.

114.   Co-Conspirator GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("**GuideWell**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Florida where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

115.   The principal headquarters for GuideWell is located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.

116.    Co-Conspirator Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("**Hawaii Medical**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Hawaii where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

117.    The principal headquarters for Hawaii Medical is located at 818 Keeaumoku Street, Honolulu, Hawai'i 96814.

118.    Co-Conspirator Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("**HCSC-IL**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Illinois where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

119.    The principal headquarters for HCSC-IL is located at 300 E. Randolph Street, Chicago, Illinois 60601.

120.    Co-Conspirator Blue Cross and Blue Shield of Montana, including its predecessor Caring for Montanans, ("**HCSC-MT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Montana, where it is one of the largest health insurers, as

measured by number of subscribers, within its exclusive, protected service area. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012. Health Care Service Corporation has assumed liability for claims involving Blue Cross and Blue Shield of Montana prior to the 2012 acquisition.

121.    The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena, Montana 59604-4309.

122.    Co-Conspirator Blue Cross and Blue Shield of New Mexico ("**HCSC-NM**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Mexico where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

123.    The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.

124.    Co-Conspirator Blue Cross and Blue Shield of Oklahoma ("**HCSC-OK**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oklahoma where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

125.   The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa, Oklahoma 74119.

126.   Co-Conspirator Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("**HCSC-TX**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Texas where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

127.   The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive, Richardson, Texas 75082.

128.   Co-Conspirator Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("**Highmark-DE**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Delaware where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

129.   The principal headquarters for Highmark-DE is located at 800 Delaware Avenue, Wilmington, Delaware 19801.

130.   Co-Conspirator Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York ("**Highmark Northeastern NY**")

has agreed to and participates in the Blue conspiracy using the Blue Shield trademark and trade name in Northeastern New York, where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as 13 counties in Northeastern New York.

131.    The principal headquarters for Highmark Northeastern NY is located at 257 West Genesee Street, Buffalo, New York 14202.

132.    Co-Conspirator Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("**Highmark-WV**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in West Virginia where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

133.    The principal headquarters for Highmark-WV is located at 700 Market Square, Parkersburg, West Virginia 26101.

134.    Co-Conspirator Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("**Idaho Health**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Idaho where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

135.   The principal headquarters for Idaho Health is located at 3000 East Pine Avenue, Meridian, Idaho 83642.

136.   Co-Conspirator Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("**Louisiana Health**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Louisiana where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

137.   The principal headquarters for Louisiana Health is located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.

138.   Co-Conspirator HealthyDakota Mutual Holdings d/b/a Blue Cross Blue Shield of North Dakota ("**BCBS-ND**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Dakota where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

139.   The principal headquarters for BCBS-ND is located at 4510 13th Avenue South, Fargo, North Dakota 58121.

140.   Co-Conspirator Premera and Premera Blue Cross, which also d/b/a Premera Blue Cross Blue Shield of Alaska (together, "**Premera-AK**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield

trademarks and trade names in Alaska where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

141.  The principal headquarters for Premera-AK is located at 2550 Denali Street, Suite 1404, Anchorage, Alaska 99503.

142.  Co-Conspirator Premera and Premera Blue Cross, which also d/b/a Premera Blue Cross Blue Shield of Washington ("**Premera-WA**") has agreed to and participates in the Blue conspiracy using Blue Cross trademarks and trade names in the State of Washington, where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

143.  The principal headquarters for Premera-WA is located at 7001 220th Street SW, Mountlake Terrace, Washington 98043-4000.

144.  Co-Conspirator Triple-S Management Corporation and Triple S-Salud, Inc. ("**Triple-S**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Puerto Rico, where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

145.  The principal headquarters for Triple-S is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.

146.  Co-Conspirator USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas

("**USAble**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arkansas where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

147.   The principal headquarters for USAble is located at 601 S. Gaines Street, Little Rock, Arkansas 72201.

148.   Co-Conspirator Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa (together, "**Wellmark-IA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Iowa where it, like many other Defendant and Co-Conspirator Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

149.   The principal headquarters for Wellmark-IA is located at 1331 Grand Avenue, Des Moines, Iowa 50306.

150.   Co-Conspirator Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of South Dakota (together, "**Wellmark-SD**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Dakota where it, like many other Defendant and Co-Conspirator Insurance Companies in their

allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

151.  The principal headquarters for Wellmark-SD is located at 1601 W. Madison, Sioux Falls, South Dakota 57104.

## V.    RELEVANT MARKETS

152.  Defendant and Co-Conspirator Insurance Companies, both among themselves and with the Association, agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendant and Co-Conspirator Insurance Companies to compete against each other to negotiate price terms, contract, and pay healthcare providers for provided healthcare services. Defendant and Co-Conspirator Insurance Companies' "Exclusive Service Areas" and the output-reducing National Best Efforts Rule and Local Best Efforts Rule are enforced by the Association through the Association license and membership agreements.

153. Under those agreements, any Defendant or Co-Conspirator Insurance Company that competes against one of its co-conspirators to contract for the purchase of healthcare services from a provider, including Plaintiff, contrary to its agreement, could lose its license to use the Blue trade name and/or trademarks and would have to pay substantial penalties to the other Defendant and Co-Conspirator Insurance Companies through the Association. Defendant and Co-Conspirator Insurance Companies enforce their anticompetitive agreements through this mechanism.

154.    Each Defendant or Co-Conspirator Insurance Company enters into a license agreement with the Association to use the Blue brand to sell commercial health insurance services and contract with healthcare providers in an Exclusive Service Area. Under the rules agreed to by Defendants and Co-Conspirators, with certain limited exceptions, the Defendant or Co-Conspirator Insurance Company's allotted Exclusive Service Area is the only area the Defendant or Co-Conspirator Insurance Company is allowed to provide insurance services and to contract with healthcare providers to purchase healthcare services. Each Defendant or Co-Conspirator Insurance Company also agrees in the Association license agreement it will not enter any Exclusive Service Area to another Defendant or Co-Conspirator Insurance Company and compete against that Defendant by offering Blue-branded insurance services to any account that is headquartered in that Exclusive Service Area or by purchasing healthcare services from a provider in that Exclusive Service Area. Even in the limited areas where the Exclusive Service Area of two Defendant and Co-Conspirator Insurance Companies overlap, all other Defendant and Co-Conspirator Insurance Companies are prohibited from selling health insurance services and negotiating price terms and contracting with healthcare providers in those Exclusive Service Areas. These agreements are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do prevent, Defendant and Co-Conspirator Insurance Companies from competing against

each for the supply of healthcare services outside of their respective Exclusive Service Areas.

155.   Defendant and Co-Conspirator Insurance Companies participate in the market for the purchase services from healthcare providers. Outside of payments by the federal government and state governments in Medicare, Medicaid, and related government-sponsored non-employee programs, the vast majority of those services are paid through or by health insurance companies.

156.   Healthcare providers compete for inclusion in the provider networks of insurers' plans. For a given healthcare provider, the question defining the product market is "Who are the payors with whom I can contract?" Where the Defendant and Co-Conspirator Insurance Companies combine to make the vast majority of commercial insurance payments, the answer is the same, regardless of who the provider is—the Defendant and Co-Conspirator Insurance Companies, the few non-Defendant or Co-Conspirator Insurance Company commercial insurers with a small presence in the state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid. All providers, regardless of their type, face these options.

157. Defendant    and    Co-Conspirator    Insurance    Companies' anticompetitive practices and market power permit Defendant and Co-Conspirator Insurance Companies to pay in-network providers less than they would have paid absent these violations of the antitrust laws. Defendant and Co-Conspirator Insurance Companies pay in-network providers pursuant to provider

agreements. Precisely because of Defendant and Co-Conspirator Insurance Companies' market power within each of their respective Exclusive Service Areas, providers wishing to join the Blue network—and to access the Blue-covered patient population—have limited bargaining power. The terms of the provider agreements, including the offered payments for medical services, are often given on a "take it or leave it" basis. As a general matter, even when negotiation of payment terms exists, it occurs within a narrow range dictated by the local Blue.

158. The local Blue generally pays significantly less than other commercial payers. Certain healthcare providers are required to publish contracted reimbursement rates pursuant to certain price transparency regulations promulgated within the last few years. The price transparency disclosures by Plaintiff demonstrate this pattern.

159. Defendant and Co-Conspirator Insurance Companies undertook a coordinated effort to allocate the market in which each of the Defendant and Co-Conspirator Insurance Companies would operate free of competition from other Defendant and Co-Conspirator Insurance Companies. They did this through a pretextual licensing scheme that imposes geographic restrictions in the trademark licenses granted to each Defendant.

160. Absent competition, the Defendant and Co-Conspirator Insurance Companies have achieved significant market power and domination in the markets in their Exclusive Service Areas. The geographic restrictions have barred

competition from the respective commercial health insurance markets and the market for healthcare provider services. Their illegal conduct has damaged and continues to damage Plaintiff.

161.   Each of the Defendant and Co-Conspirator Insurance Companies is an independent economic actor. Defendant and Co-Conspirator Insurance Companies do not have common shareholders or ownership. Each has its own sales, revenue, and costs and makes its own profits and losses, which only benefit its own shareholders or stakeholders. Each Defendant or Co-Conspirator Insurance Company is an actual or potential competitor of every other Defendant or Co-Conspirator Insurance Company, as they all sell similar products and services and—but for the illegal acts alleged herein—could and would enter into each other's Exclusive Service Area to compete for the purchase of healthcare services in each Exclusive Service Area. As actual or potential competitors, each with its own profits and losses, the Defendant and Co-Conspirator Insurance Companies, in the absence of the anticompetitive agreements alleged herein, each have an economic incentive to, and would, act as an independent center of economic decisionmaking. Each would compete against the other Defendant and Co-Conspirator Insurance Companies for providers to expand its network and increase its own sales and profits. The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition. No Defendant or

Co-Conspirator Insurance Company has withdrawn from the agreements to engage in the alleged anticompetitive conduct and associated enforcement terms.

162.   But for the illegal agreements to restrict output and allocate customers, the Defendant and Co-Conspirator Insurance Companies could and would use their Blue brands and non-Blue brands to compete with each other for the business of Plaintiff, which would have resulted in greater competition and would have increased prices paid to Plaintiff for its healthcare services.

163.   At some point in 2021, the Association did away with the National Best Efforts Rule that limited the amount of revenue a Blue could earn outside a given Blue's Exclusive Service Area. Dropping the rule, however, has had no impact on the market for the purchase of healthcare provider goods or services. Since 2021, Plaintiff has not observed any incremental, much less significant, market entry by Blues outside their respective Exclusive Service Areas. Since 2021, Plaintiff has generally not been approached by Blues from outside their Exclusive Service Area to negotiate in-network agreements covering their respective geographic areas.[1]

164.   For example, as measured by total enrollment, Anthem is the largest health insurer in the United States, with approximately 45 million enrollees. The Defendant and Co-Conspirator Insurance Companies have allocated Anthem across the geographic areas of all or part of 14 states. Anthem also offers "green"

---

[1] This does not address instances in which Plaintiff may have a facility in a county contiguous to a particular Defendant or Co-Conspirator Insurance Company's Exclusive Service Area.

insurance throughout the United States through its non-Blue subsidiary, UniCare. Anthem also operates in a number of states outside of its Exclusive Service Area through its Medicaid subsidiary, Amerigroup. Because Anthem is already operating outside of its Exclusive Service Area via UniCare and Amerigroup, Anthem could compete outside of its Exclusive Service Area, but for the illegal territorial restrictions and output limitations alleged herein. Anthem acquired UniCare (through a merger with WellPoint) in 2004 to compete as a non-Blue brand. In 2006, however, Anthem froze UniCare expansion at the behest of and in agreement with the other Defendant and Co-Conspirator Insurance Companies, and by 2008, was considering selling UniCare to "[e]liminate[] source of friction with other Blues."

165.    Health Care Service Corporation likewise operates in many states. It has an Exclusive Service Area of Illinois, Montana, New Mexico, Oklahoma, and Texas. It is the fourth largest health insurance company in the United States. Health Care Service Corporation could and would contract and/or negotiate price terms with healthcare providers outside of its Exclusive Service Area, but for the illegal territorial restraints and output restrictions alleged herein.

166.    The Antitrust Division of the Department of Justice defines a *per se* illegal allocation scheme as follows: "allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on

contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

167.    By creating and enforcing the Exclusive Service Areas and the other anticompetitive rules and agreements of the Association, including the restrictive provisions of their respective license agreements with the Association, Defendant and Co-Conspirator Insurance Companies have entered into *per se* illegal agreements in the health insurance market and market for payment of healthcare providers.

168.    If the market allocation and/or output restrictions were eliminated, then Defendant and Co-Conspirator Insurance Companies would also compete to a greater extent for healthcare providers in the relevant market. This would reduce market concentration in the relevant market because the Defendant and Co-Conspirator Insurance Companies would exercise their newfound ability to negotiate price terms and contract with providers in the Exclusive Service Area of other Defendant and Co-Conspirator Insurance Companies. Reimbursement prices paid to providers would increase and the market for payment of healthcare services would become much more competitive. Eliminating the anticompetitive conduct would also improve quality by allowing providers to negotiate price

terms and contract with Defendant and Co-Conspirator Insurance Companies with superior and innovative services.

169.    The    Defendant    and    Co-Conspirator    Insurance    Companies collectively use their market power to achieve anticompetitive results in the relevant market for payment of healthcare providers as is demonstrated by their ability to limit provider choice, to fix prices below the competitive level, reimburse at below market rates, and to impose onerous terms on providers, all without losing market share.

170.    At    a    minimum,    Defendant    and    Co-Conspirator    Insurance Companies have exercised their collective market power over the payment of healthcare providers, even as their illegal and anticompetitive horizontal restraints limit output and restrict the options of Plaintiff to just one of the Defendant and Co-Conspirator Insurance Companies in each Exclusive Service Area.

171.    The Defendant and Co-Conspirator Insurance Companies have, at a minimum, profitably instituted a small but significant and non-transitory decrease in the price the Defendant and Co-Conspirator Insurance Companies pay for healthcare services to providers without losing collective market share or causing their companies to be less profitable.

## VI.    FACTUAL ALLEGATIONS

### A.    OVERVIEW OF THE INDUSTRY

172.   Defendants and Co-Conspirators are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and provide healthcare insurance coverage to approximately 115 million Americans. Defendants and Co-Conspirators also work with more providers than any other insurer and have 1.7 million doctors and hospitals in their network. According to multiple Defendants and Co-Conspirators, more than 96% of hospitals and 92% of professional providers contract with one of the Blues nationwide—"more than any other insurer."

173.   Defendants' and Co-Conspirators' market power in both the national and state markets follow from their sheer size. They insure about half of all people with private health insurance domestically. In every state, Defendants and Co-Conspirators are either the largest or one of the largest insurers. In some parts of the U.S., Defendants and Co-Conspirators enroll 90% or more of all private insureds. They otherwise enroll well above a majority of the private insureds. In Pennsylvania, Defendants Capital, Highmark-PA, and Independence Blue Cross control 74% of the market for private health insurance.

174.   The Blues include many of the largest potentially competitive health insurance companies in the United States. Indeed, Elevance is the second largest health insurance company in the country by total medical enrollment, with approximately 46 million subscribers. Similarly, 5 of the 10 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue Cross and Blue Shield licensees have imposed on themselves

as discussed below, these companies would compete against each other in the markets for healthcare financing and health services.

175.   Elevance is the Blue Cross and Blue Shield licensee for California (Blue Cross only), Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (in the New York City metropolitan area and upstate New York), Ohio, portions of Virginia, and Wisconsin. Elevance also operates in a number of additional states through its non-Blue brand Medicaid subsidiary, Wellpoint. But for the illegal territorial restrictions summarized above, Elevance would be likely to offer its healthcare financing throughout the United States in competition with the other Blues, including in Pennsylvania. If Elevance did develop and operate a provider network in Pennsylvania, it would provide increased competition, and such competition would result in higher payments to providers. Elevance admitted its desire to compete nationwide, including in Pennsylvania, in its trial brief supporting its predecessor Anthem's attempt to merge with Cigna: "a prime reason for the proposed merger is to provide Anthem with Cigna's nationwide network so that Anthem may for the first time become a true nationwide competitor." Anthem Br. at 10. Elevance also stated that its membership in the Association "will not diminish Anthem's incentives to compete through the Cigna brand in the 36 states where Anthem does not hold a Blue license. Anthem will have powerful incentives to win business through Cigna in those states because the margins on such business far exceed any

BlueCard fees to be earned if another Blue happens to win the business." *Id.* at 12.

176.   GuideWell is the seventh largest health insurer in the country by total medical enrollment, with approximately 7.7 million subscribers in its service area of Florida. But for the illegal territorial restrictions summarized above, GuideWell would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

177.   BCBS-MI is the eighth largest health insurer in the country by total medical enrollment, with approximately 4.5 million subscribers in its service area of Michigan. BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

178.   California Physicians' Service is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.8 million subscribers in California. California Physicians' Service already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, California Physicians' Service would

be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

179.   BCBS-AL is one of the largest health insurers in the country by total medical enrollment, by some measures, with approximately 2.8 million subscribers. But for the illegal territorial restrictions summarized above, BCBS-AL would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

180.   CareFirst-DC and CareFirst-MD, which operate the Blues in Maryland, the District of Columbia, and parts of Virginia, are one of the largest health insurers in the U.S. and the largest not-for-profit healthcare insurer in the Mid-Atlantic region, with approximately 3.5 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst-DC and CareFirst-MD would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

181.   BCBS-MA is one of the largest health insurers in the country by total medical enrollment, with approximately 3 million subscribers in Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its healthcare financing in more regions across the United States in

competition with the Blue in those regions, including in Pennsylvania. Such competition would result in higher payments to providers in those areas.

182.    Defendants' and Co-Conspirators' dominance is unlikely to be challenged by new entrants given high barriers of entry to operate as a health insurer. For example, a new entrant must qualify as an insurer in any state where it wishes to enter the business of insurance. That is an expensive and time-consuming process. A new entrant must then develop broad networks of physicians, hospitals, and medical service providers across multiple locations, to attract customers. Insurers must take years trying to build up significant provider networks in many areas, potentially at a large cost and over a long time horizon, and may not succeed. The entrant must also obtain from providers prices competitive with those offered to the market's leading incumbent insurers, a prospect that is difficult for any new insurer who can offer only providers a small initial volume of patients.

183.    Defendants and Co-Conspirators reinforce and perpetuate these barriers to entry. They cooperate so they can offer in-network providers nationwide, no matter how local the subscriber base of each plan is. In this context, it is extremely difficult for a new entrant to efficiently negotiate as extensive a network as the Associations' to be competitive.

184.    Defendants and Co-Conspirators also has widespread name recognition. A new insurance plan attempting to enter the market would need costly marketing, and even then would be unlikely to succeed. These high costs

and high risks of failure, combined with other entry barriers, dissuade most investors from launching new plans to attempt to compete.

185.   The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

186.   The Association is a separate legal entity that purports to promote the common interests of the Blues. The Association describes itself as "a national federation of 34 independent, community-based and locally operated Blue Cross and Blue Shield companies." The Association refers to the 34 Blue Cross and Blue Shield companies as "Member Plans."

187.   The Association serves as the epicenter for Defendant and Co-Conspirator Insurance Companies' communications and arrangements in furtherance of their agreements not to compete. As the Association's then-general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "[The Association]'s 39 [now 34] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One Co-Conspirator Insurance Company has admitted in a 2011 Form 10-K that "[e]ach of the [34] BCBS [] companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

188.   Every Blue is a member of the Association, every Blue CEO is on the Board of Directors of the Association, and every Blue participates in numerous Association Committees.

189.   The Blues govern the Association. The Association and its Board of Directors are entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

190.   As at least one federal court has recognized, the Association "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

191.   In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n litigation in the Northern District of Illinois, Civil Action No. 09-c-5619*, the Association admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and [the Association]'s own chief executive officer." The current Chairman of the Board of Directors, Brian D. Pieninck, is also the President and CEO of CareFirst. The Board of Directors of the Association meets at least annually.

192.   Association meetings provide a forum for representatives of Defendant and Co-Conspirator Insurance Companies to share information on management of Defendant and Co-Conspirator Insurance Companies and specific health insurance issues common to Defendant and Co-Conspirator Insurance

Companies, and this information is disseminated to all 34 members, including reimbursement rates for providers. The Association includes numerous committees governed by Defendant and Co-Conspirator Insurance Companies and sponsors various meetings, seminars, and conferences Defendant and Co-Conspirator Insurance Companies attend. All of these activities are in furtherance of Defendant and Co-Conspirator Insurance Companies' unlawful agreements.

193.   The Blues also control the Association's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the Association Board of Directors that is composed of nine Member Plan CEOs and three independent members. This Committee has the power to enforce the requirements of the license agreements.

194.   The Blues control the entry of new members into the Association. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, the Association admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of the Association's Board" and that the Association "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved." *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross Blue Shield Assoc.*, Br. of Appellee, 1997 WL 34609472, at *7, 21 (filed Jan. 9, 1997) ("Sixth Circuit Brief").

195.   The Blues control the rules and regulations that all Association members must obey. According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross License Agreement and the Blue Shield

License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id.* at n.4.

196.   The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, every Blue "agrees . . . to comply with the Membership Standards." In the Sixth Circuit Brief, the Association described the provisions of the License Agreements as something the Blues "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the Blues most recently met to adopt amendments, if any, to the licenses on September 19, 2024. The License Agreements are entered into between the Association and the individual Blues and are governed by and construed and interpreted in accordance with Illinois law.

197.   The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the

Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

198.  The Blues themselves police the compliance of all members of the Association with the rules and regulations of the Association. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the License Agreements and Membership Standards. Based on that determination, PPFSC makes a recommendation to the [the Association] Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "[the Association] shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

199.  The Blues control and administer the disciplinary process for members of the Association that do not abide by the Association's rules and regulations. The Guidelines describe three responses to a Member Plan's failure to comply—"Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a Member Plan's license.

200.    The Blues likewise control the termination of existing members from the Association. The Guidelines state that, based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the [the Association] Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in the Association] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit Brief, the Association admitted that the procedure for terminating a License Agreement between the Association and a Member Plan includes a "double three-quarters vote" of the Member Plans of the Association: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

201.    A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC"), which controls the national or Inter-Plan Programs of the Blues. In each of their licensing agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

202.    The Blues are potential competitors that use their control of the Association to coordinate their activities. As a result, the rules and regulations

imposed by the Association on the Member Plans are in truth imposed by the Member Plans on themselves.

203.  In furtherance of the anti-competitive agreements alleged herein, the Blues also exchanged granular, current, and competitively sensitive claims data using Blue Health Intelligence ("BHI"), a licensee of the Association that is managed by a Board of Managers entirely comprised of BCBS executives—currently, executives of Highmark, Health Care Service Corporation, Aware, BCBS-MI, BCBS-AL, BCBS-MA, and BCBS-NC. In 2013, BHI acquired Intelimedix, which licensed a claims database comprised of 140 million subscribers' in-network pricing data contributed by BCBS companies. Designed to lower healthcare reimbursement to providers, Intelimedix has explicitly stated that "we all share information."

204.  BHI receives pricing and claims data from the Association, which in turn receives these data from each of its Blues Member Plans. BHI uses the Association claims data, called the National Data Warehouse Core, to perform analytic reports on in-network pricing for the benefit of Blues plans. Typically, insurance companies and providers consider these data proprietary and highly confidential. Yet, BHI provides a mechanism for the sharing of such pricing data among all the Blues. These data are used for the purpose, and with the effect, of lowering reimbursements to providers, stabilizing the Blues' pricing for healthcare services provided by hospitals and professionals in various markets, and managing the various anti-competitive national Association programs.

205.   Prior to the time period in which Plans submitted claims data directly to the Association, Plans submitted data directly to BHI. Among those entities that BHI transmitted claims data to was Consortium Health Plans, Inc., discussed further below.

206.   Each Association licensee is an independent legal organization. The Association has never taken the position that the formation of the Association changed the fundamental independence of the individual Blues. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

207.   In the Sixth Circuit Brief, the Association admitted that the Blues formed the precursor to the Association when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which the Association sponsored, and its officers reviewed prior to publication, describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

208.   The Association is a vehicle used by admittedly independent health insurance companies to plan, coordinate, and enter into agreements that restrain competition. Because the Association is owned and controlled by its Member Plans, any agreement between the Association and one of its Member Plans constitutes a horizontal agreement between and among the Member Plans themselves.

209.   As detailed herein, the Association not only enters into anti-competitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendant and Co-Conspirator Insurance Companies to suppress competition. The Association is a convenient organization through which Defendant and Co-Conspirator Insurance Companies enter into illegal territorial restraints between and among themselves.

**B.    HISTORY OF THE BLUE CROSS AND BLUE SHIELD SYSTEM**

210.   The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently. Later, the plans jointly conceived of using the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand with each plan operating within its local area. While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

211.    The Association was created by Blues to support this endeavor and is entirely controlled by the Blues. The history of the Association demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blues, and to ensure that each Blue would be unimpeded by other Blues within its local service area.

### 1.    BEFORE THE LONG-TERM BUSINESS STRATEGY

212.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

213.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a plan was "approved," the American Medical Association ("AMA") responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

214.   Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

215.   Despite the Association's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

216.   By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans.

Competition in the same geographic areas under the Blue Cross name, as well as the Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day. For example, the Durham and Chapel Hill plans competed with each other under the Blue Cross name from 1938 until 1968, and these plans continued to compete under the Blue Shield name for six years after that. Plans that are now part of Excellus and Elevance have been competing under the Blue Cross and Blue Shield names since 1947, and plans that are now part of BCBS-Western New York and Excellus have been competing under the Blue Cross and Blue Shield names since 1952. Cross-on-Cross competition, Shield-on-Shield competition, or both, exist or have existed in California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, Washington, and Wisconsin. Moreover, not all of this competition is based on historical practices; Premera-WA and Cambia-ID began competing under the Blue Shield name in Washington in 1995, and they continue to compete there.

217.  From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

218.  According to an affidavit of C. Rufus Rorem, who was the Director of the Blue Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in a single service area to reduce healthcare costs."

The manner of reducing healthcare costs was to eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans at reimbursement rates favorable to the plans: "One of several Plans operating in the same area with an enrollment of only a small fraction of the area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan . . . . The operation of only one Plan per service area helped the Plan obtain the participation of hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace."

219.   In the 1950s, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

220.   In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services . . . to [the American Hospital Association ("AHA")]" (the "1954 Agreement"). Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans . . . developed certain territorial

rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

221. The 1954 Agreement also placed an obligation on plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified noncontracting hospitals."

222. Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans. The agreement specified that the Blue Cross plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the AHA House of Delegates.

223. With respect to the Blue Shield entities, the 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope. That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical

care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations."

224. The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization." In 1976, it again changed its name to the "Blue Shield Association." Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

225. The 1952 agreement did not contain any provision relating to plans developing territorial rights. Instead, it provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

226. In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')." The 1972 Agreement then sought to expand the scope of the service marks by providing that the Blue Cross plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such plan the right to use the new Licensed Marks "as

service marks, in the sale and advertising of programs for healthcare and related services operated on a non-profit basis."

227.   The 1972 Agreement also included territorial restrictions in the license: the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

228.   Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

229.   In prior litigation, the Association has stated that local plans transferred their rights in the Blue Cross and Blue Shield names and marks to precursors of the Association because those plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

230.   In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating. In an annual report to the associations in 1979, President Walter McNerney said his focus was on the "need for the Plans, within the framework of the Associations, to work together in today's challenging environment and to do so with a renewed sense of common mission."

231.   Mr. McNerney further noted that "problems" existed, "particularly where cooperative action among 2 or more Plans is required." He called for "mutual respect" among plans, decrying the "hazards" of competition across service areas and the submission of "highly competitive" prices by an out-of-area plan. With respect to one Blue plan encroaching on the territory of another Blue plan, he said "[t]he home Plan may resent the intrusion openly or covertly and add more fuel to antagonism within the system with the potentially perverted result of weakening mutual support and heightening the type of anxiety that leads to destructive competition." He added that "national accounts can only be served by coordinated action, and because national accounts are growing in importance, so is coordinated action." He concluded with a call for "coordinated action."

232.   This "coordinated action" raised antitrust concerns. In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

233.   By 1982, the process of the merger to form the Association had been completed. At that time, the Association became the sole owner of the various Blue Cross and Blue Shield trademarks, trade names, and service marks that had previously been owned by the local plans.

## 2.    THE LONG-TERM BUSINESS STRATEGY AND ASSEMBLY OF PLANS

234.   In the early 1980s, the Blues fundamentally changed the way they conducted business. The Blues, through a work group organized by the Association to create a set of mandates that became known as the "Long-Term Business Strategy." Edwin R. Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant Anthem-Empire, which is a part of Elevance), led the effort.

235.   Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield plan was an autonomous company with a local presence, but often with strategic plans to compete in other service areas—whether within a state or across state lines. Some plans saw the importance of national accounts and wished to compete for all of these accounts, notwithstanding their territorial basis.

236.   Competition across service areas was so common among the Blues that it had a name: "Blue Sharking." Some plans saw themselves as competing with other commercial health insurers who had a national presence and national provider networks. These plans, in particular, were not interested in other Blue plans and the Association telling them what they could and could not do with their capital, that they must coordinate with anyone, and that they must cede any authority to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

237.   Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the Long-Term Business Strategy as a

"fundamental change" that would result in "a concentration of power." The Blues approved the Long-Term Business Strategy the next day.

238.  According to the Long-Term Business Strategy itself, two of the three "measures of success" for the Blue Cross and Blue Shield organization were market share and profit. The mandates of the Long-Term Business Strategy were designed to further these goals in part by reducing competition among Association member plans.

239.  Two of the mandates contained in the Long-Term Business Strategy reduced competition among the Blues by reducing the number of Blues who could compete with each other. Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so that there would be only one Blue per state by the end of 1985, "except where the Association Board of Directors agrees that business needs dictate otherwise."

240.  When he presented these propositions, Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," questioning why "it makes good business sense for four corporations in one state to chase a total market potential of 677,000 employed people." He asked, "Can we really justify 12 member corporations in one state—even though it is a large one?"

241.   Although the Blues approved these propositions, some Blue plans disagreed with this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of GuideWell, sent a letter to Werner in 1982 expressing reservations about portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said that "[t]he large market share of the system of plans would have precipitated anti-trust actions were it not for the insurance industry exemptions and the community-service orientation." Blue Cross of Central New York stated in a position paper, "Blue Cross of Central New York is opposed to statewide merger or consolidation. Such a move would destroy virtually everything our community leaders have built in our 10-county service area in the 47 years we have functioned as a community organization. . . . Home rule and local autonomy were the key reasons for the Plan's creation." Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen the Association, and "a concerted effort to establish a corporate entity."

242.   The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number of Blues in the years after they adopted the Long-Term Business Strategy. In 1980, there were 114 Blues. By 1989, there were 75, and now, there are 34. Competition between Blue Cross plans and Blue Shield plans

ended in all but a few states. Another important mandate of the Long-Term Business Strategy was Proposition 3.4: "Launch an intensified program to retain, acquire and expand provider and professional payment differentials." "Differentials" referred to the difference between healthcare providers' billed charges and what the Blues paid, which was an advantage for the Blues because its competitors generally paid the providers' billed charges. (Later, the Blues sometimes used "differentials" to mean the difference between what the Blues pay a healthcare provider and what their competitors pay.) In other words, the Blues unlawfully agreed to reduce the payments they were making to providers. Among the steps for implementing Proposition 3.4 was for the "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

243. Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers.

244. Another mandate of the Long-Term Business Strategy was Proposition 1.4, "Continue study of Blue Cross and Blue Shield organization and

make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985:

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of the Association, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in the Association.

245.    The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of the Association approved this proposal in 1986. On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively. In June 1986, John Larkin Thompson, the CEO of BCBS-MA, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the "White Paper."

246.   The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' service areas.

247.   It acknowledged, however, that Exclusive Service Areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing United States v. Sealy, 388 U.S. 350 (1967) and United States v. Topco, 405 U.S. 596 (1972)] . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

248.   During this process, it was clear that the reason for preserving Exclusive Service Areas was to prevent competition that would otherwise arise among the Blues. According to an internal report about the Assembly of Plans,

"Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare." And the result of reduced competition was lower payments to providers; according to the same report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts." According to the internal Assembly of Plans report, Exclusive Service Areas create "[l]arger market share because other Blues stay out and do not fragment the market" and "[s]tronger provider agreements for the same reason."

249.   Despite the significant legal problems with Exclusive Service Areas, the Assembly of Plans considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate territorial allocation entirely.

250.   Ultimately, through nine meetings of the Assembly of Plans from 1987 through 1989, and despite open acknowledgement that a number of plans were happily competing with each other outside their Exclusive Service Areas, the Assembly of Plans issued its Final Report on February 8, 1990. It recommended to the Association approval of new license agreements that would tie together licensing of the Blue marks and membership in the Association (and satisfaction of its membership standards; prior to this, a plan was not required to be a member of the Association to obtain a license to use the Blue marks).

251.   When these license agreements were executed, the Association acquired the ability to enforce Exclusive Service Areas by membership restrictions in the Association, limitations on use of the BCBS name and marks,

and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

### 3.    DEFENDANT AND CO-CONSPIRATOR INSURANCE COMPANIES ENTER INTO UNLAWFUL AGREEMENTS

252.    Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as taxable stock insurance companies.

253.    Since 1986, some Blues have converted to for-profit organizations. The largest, Elevance, reported a net income of $5.97 billion in 2024. As described in more detail below, many of the Blues that have remained nominally nonprofit behave like for-profit companies by building up unnecessarily high levels of surplus and paying outsized compensation to executives.

254.    Although the Assembly of Plans eliminated the potential for Association-sanctioned "Blue-on-Blue" competition in most states, it left open the possibility of competition from non-Blue subsidiaries of Defendant and Co-Conspirator Insurance Companies, an increasing "problem" that had caused complaints from many Blues. After the 1986 revocation of the Blues' tax-exempt status and throughout the early 1990s, the number of non-Blue subsidiaries of Blues increased.

255.    As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former Association counsel Marv Reiter explained in 1991, "Where you

had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the member plans of the Association discussed ways to rein in such non-Blue branded competition.

256.    Subsequently, Defendant and Co-Conspirator Insurance Companies agreed to restrict the territories in which Defendant and Co-Conspirator Insurance Companies would operate under any brand, Blue or non-Blue, as well as the ability of non-members of the Association to control or acquire the member plans.

257.    Pursuant to the agreement of Defendant and Co-Conspirator Insurance Companies, the Association developed strict rules and regulations that all members of the Association must obey, and guidelines that proposed members must adhere to prior to joining the Association. These rules and regulations include the License Agreements, the Membership Standards, and the Guidelines. These agreements, some of which were revised or reviewed at least as of 2024, are the agreements at issue in this case.

258.    These License Agreements depart from, and supersede, the previous licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provide that the plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of [the

Association] in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

259.   Significantly, however, the License Agreements provide that "[the Association] and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system." To accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined service areas. The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below." Paragraph 5 sets forth these new service areas as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

260.   Despite the expanded scope of the license and the newly defined service areas, the License Agreements failed to include the provision—contained in both the 1954 and 1972 Agreements—that required the plan to treat providers fairly. To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with healthcare providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the

Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

261.    In 1990, Defendant and Co-Conspirator Insurance Companies developed an amended license agreement that continued to require that all Blue license holders be non-profit entities. At that point, Associated Insurance Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused to sign the amended license agreement, and when it "bought the giant Dallas-based American General Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according to M. Edward Sellers, a former [Association] vice president who became President and CEO of BCBS-SC in 1987. Soon the Indiana Plan was competing under another brand name in many other Plans' home markets." *The Blues: A History of the Blue Cross and Blue Shield System* at 241. During the 1990s, in order to end the developing competition, Defendant and Co-Conspirator Insurance Companies agreed to restrict non-Blue competition and to develop the Blue Card Program in a highly anti-competitive manner described previously in this Complaint.

262.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic service area, which is either the geographical area(s) served by the plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

263. Under the Guidelines and Membership Standards that were developed in the early- to mid-1990s, each Defendant or Co-Conspirator Insurance Company agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated service area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant or Co-Conspirator Insurance Company also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated service area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue-branded business. These agreements have been described by the Blues as the "National Best Efforts" rule. They were adopted in 2005, renewed in 2015, and purportedly terminated in April 2021 in connection with Defendants' and Co-Conspirators' settlement of a class action antitrust lawsuit brought on behalf of insurance subscribers.

264. The National Best Efforts rule is a naked output restriction. It was intended to and has limited each Blue's ability to generate revenue from non-Blue branded business and to develop or acquire non-Blue health insurance companies that compete with the Blues. For example, it was a major factor in a 2017 judicial decision to enjoin Anthem's proposed merger with Cigna, a national non-Blue

commercial insurer, which would have caused Anthem to violate the National Best Efforts rule, absent significant conversion of Cigna-branded business to Blue-branded business. Anthem sought to expand competition outside of its service areas, but its membership in the Association limited its ability to do so. The limitations the National Best Efforts rule has imposed on non-Blue branded business has lowered Plaintiff's and other health care providers' output of health care goods, services, and facilities. It has created a disincentive for a Blue to contract with health care providers within a service area using a non-Blue branded plan, and—of particular relevance to the market allocation conspiracy—a disincentive for a Blue to contract with health care providers outside of its service area for the purpose of supplying health care goods, services, and facilities to subscribers of non-Blue branded insurance plans also owned or controlled by the Blue. Even in the limited instances in which a Blue offers a competing, non-Blue-branded product within or outside of a service area, the revenue restrictions limit investment in the non-Blue branded product, making it less competitive.

265.   By means of their membership in the Association, each Blue agreed to comply with, and did in fact comply with, the National Best Efforts rule. These agreements have been a part of the market allocation conspiracy and operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiff and other health care providers and to reduce or eliminate competition for contracts with Plaintiff and other health care providers. settlement of antitrust claims brought by a national class of Blue Plan subscribers,

the effects of the National Best Efforts rule have continued to cause artificially low reimbursement rates to Plaintiff and other health care providers.

266.   In addition to the National Best Efforts rule, under the Guidelines and Membership Standards, each Blue has also agreed that at least 80% of the annual revenue (as defined by Association rules) that it or its subsidiaries generate from commercial insurance within its service area must be derived from services offered under the licensed Blue Cross and/or Blue Shield trademarks and trade names. These agreements have been described by the Blues as the "Local Best Efforts" rule. The Local Best Efforts rule was adopted in 1994. Like the National Best Efforts rule, these agreements are also output restrictions that limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiff and other health care providers and to reduce or eliminate competition for contracts with Plaintiff and other health care providers. Unlike the National Best Efforts rule, the Local Best Efforts rule was not terminated in April 2021. According to Elevance's 2023 Form 10-K, Anthem-CA is required to have "substantially all" of its annual combined local net revenue be attributable to health care plans and related services "sold, marketed, administered or underwritten under the BCBS names and marks."

267.   Both the National and Local Best Efforts Rules have squarely limited the Blues' revenue-generation from non-Blue-branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

268.    Defendant and Co-Conspirator Insurance Companies also agree that they will participate in Inter-plan Programs, including Blue Card, with the billions of dollars of access fees providing the *quid pro quo* for the agreements not to compete.

269.    Therefore, Defendant and Co-Conspirator Insurance Companies have agreed that, in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive, at most, one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

270.    Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the U.S. Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the [Association] contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and

"a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

271.  These agreements drastically limited the Blues' ability to compete.

272.  The rules and regulations also prohibit acquisition of a plan by a non-Blue entity without the approval of the Association. The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." But, as alleged above, the member plans control the entry of new members into the Association. Should a non-member attempt to join the Association to obtain control of, or acquire a substantial portion of, the assets of a member plan, the other member plans can block its membership by majority vote.

273. The License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional investor becomes beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-

institutional investor becomes beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person becomes beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent or more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a member plan to a non-member entity, absent special approval.

274.    These acquisition restraints reduce competition in violation of antitrust laws because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blues. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.

275. Through the acquisition restrictions, the Blues have agreed unlawfully to force competitors to build their own networks and have effectively prohibited those competitors from choosing what is often the more efficient solution of acquiring new networks by purchasing some or all of an existing plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and, in some instances, eliminating competition.

276. Defendants and Co-Conspirators have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and [the Association]," cited unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less unlawful."

277. One plan wrote in an "Executive Overview" that "[a]ny new restrictions on 'unbranded' activities will be reviewed under the antitrust laws . . .

and could be viewed as an agreement among competing Plans and therefore an unlawful horizontal restraint . . . ."

278.    Despite this concern, the Blues eventually imposed restrictions on non-Blue businesses with the stated purpose of restraining competition. In an April 30, 2001, memorandum to the Blues, the Association expressed concern about Blues competing under non-Blue brand names. According to the Association, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

279.    Several years later, the Blues openly acknowledged the existence and importance of their agreement to collaborate and not compete. In March 2007, a participant in a "Blue Caucus" event in San Francisco stated that "[w]e intend to continue to strive to keep the interest of all Blue plans . . . aligned so the System can remain in a mutually supportive state." It was noted at the meeting that "[t]he historic success of the System has been driven by the cooperation . . . of member Plans. The future success of the System is dependent on this continued cooperation. The ability of the member Plans to focus on the collective good of the System is critical to our success."

280.  In addition to being an agreement to allocate geographic markets, the restrictions on non-Blue competition facilitated and presently continue to facilitate the Blues' monopsonization and exercise of market power by ensuring that each Blue brings more members, on a branded basis, to negotiations with providers.

281.  The Blue Cross Blue Shield structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

282.  The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standards. For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Blue's territory.

283.  Nonetheless, many Blues have entered into what they call "gentlemen's agreements" not to compete in those counties. For example, Health Care Service Corporation refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint agreed not to compete in each other's service areas, despite being allowed to do so by the Licensing Agreements. Likewise, as set forth below, Anthem-OH refused to contract with a hospital in a Pennsylvania county adjacent to Ohio, to allow fellow Blue, Highmark, to force the hospital system to accept lower reimbursement rates.

### 4.    THE BLUE CARD AND NATIONAL ACCOUNTS PROGRAMS

284.    In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of health benefit plans that covered the employees of a single employer across many states, the Blues found a way to use, maintain, and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

285.    During the early- to mid-1990s, as part of their overall agreement to restrict competition, Defendants and Co-Conspirators agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Programs. Under the Blue Card/National Accounts Programs, one—and only one—Blue may administer a national or multi-state, employee health benefit plan. The Blue where the national account is headquartered is the control plan (or "Control Blue"), while the other Blues are participating plans.

286.    The National Accounts Programs further provide that the control plan is the only Blue that may bid for the business of the national account unless that control plan cedes the right to another Blue, which is then the only Blue that may bid for the business of that national account. In other words, in this area and many others, Defendant and Co-Conspirator Insurance Companies agree that they will not compete. Defendant and Co-Conspirator Insurance Companies divide the

proceeds derived from this anti-competitive scheme either through the Blue Card Program or through separate agreements.

287.   All Blues are required to participate in the Blue Card Program, which applies when a member of the health benefit plan obtains healthcare services outside of the service area of the member's Blue plan. The Blue through which the member is enrolled is referred to as the "Home Plan," while the Blue located in the service area where the medical service is provided is referred to as the "Host Plan."

288.   Generally, when a provider treats a patient who is a member of a Blue plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays for processing and payment of the claim. The provider is paid based on the reimbursement rates or prices in the provider's contract with the Host Plan. But in order to be paid, the provider must comply with the Home Plan's provider manual, which provides information about claims administration and appeals, as well as policies and guidelines around claims submission and payment; medical policies, which address the issue of the medical need for certain goods and services; clinical or utilization management ("UM") guidelines, which focus on facility admission criteria, selection of a provider or facility, length of stay for hospitalizations, and locations where services will be covered; reimbursement policies, which explain the claims processing and editing logic that impact the payment made; and, importantly, the coverage requirements

of the Home Plan and the employee health benefit plan to which the provider often does not have access. Historically, the provider manual, medical policies, utilization management guidelines, and reimbursement policies were paper-based and only given to their contracted, or "in-network," providers. Today, some of these documents are posted online. It remains the case, however, that whether a services, procedure, good, or facility will be covered is dictated by contract or the member's health benefit plan, and that information is not available to out-of-network, or non-contracted, providers.

289.   As a result of the Blue Card Program, providers must comply with over 30 different variations of provider manuals, medical policies, utilization management guidelines, and reimbursement policies, creating inefficiencies, adding to administrative costs for providers and the healthcare system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the providers. Coverage rules also include matters such as pre-authorization and pre-notification requirements that must be satisfied before a plan will pay for services provided to one of its members. As a result, healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits, and coverage rules, frequently to no avail, and despite the fact that the providers have made no agreement with the Home Plan. In many instances, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's service area.

290.    By way of illustration, in an effort to address this highly inefficient process, hospitals in Florida set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements. Employees of the hospitals spent hours, week after week, for an extended time to try to learn those requirements. They would obtain inconsistent and incomplete answers to their inquiries. Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

291.    All healthcare providers are required to participate in the Blue Card Program as a condition of their participation in the Blue plan in their service area. As noted above, the Blues are not allowed to contract with healthcare providers outside their service area unless it is a contiguous area, and many will not even do that. Thus, a healthcare provider treating a patient who is enrolled in a Blue in another service area cannot negotiate a separate agreement with that Blue plan. Instead, the Home Plan pays the healthcare provider the discounted rate that the Host Plan has imposed on the provider. Moreover, the Blues do not allow healthcare providers to negotiate clauses in their participation contracts that would allow them to opt-out of the national programs and contract separately with the Blues.

292.    The Blue Card and National Accounts Programs are thus agreements to fix prices. Healthcare providers providing services to patients insured by or

included in employee benefit plans administered by a Blue from another service area, including Plaintiff, receive significantly lower reimbursement rates than they would receive absent Defendants' and Co-Conspirators' agreement to fix prices. In 2002, the Association reported that in 2001, the Blue Card Program saved $9 billion. This figure represents the reduction in payments to healthcare providers, including Plaintiff, that the Blues were able to obtain by allocating markets and fixing prices.

293.    The Blues share the discounts they are able to achieve through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through the Blue Card Program, a standard Blue Card fee is the access fee, which is a percentage of the Host Plan's discount that the Host Plan shares with the Home Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, Defendant and Co-Conspirator Insurance Companies, bill access fees to the account as a cost of the medical claim, even though the access fee is not paid to the provider.

294.    The Blue Card Program encourages the Blues to fix prices rather than compete, even in the limited contexts in which the Association's rules allow them to compete outside their service areas. Because of the discounts that the Blues receive through the Blue Card Program, they can lower their payments to

providers in counties contiguous to their service areas by relying on Blue Card, rather than negotiating and contracting with those providers directly.

295. By way of example, since the 1980s, BCBS-AL maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states, such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with BCBS-AL. Therefore, BCBS-AL could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

296. In 2013, BCBS-AL terminated its contracts with all hospitals in contiguous out-of-state counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals). Each of these hospitals remained in-network with its in-state Blue. Therefore, BCBS-AL could leverage the Blue Card Program to maintain access to these hospitals for its subscribers.

297. BCBS-AL identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card Program, rather than directly contracting with these hospitals. This was true, even net of the access fees it would be required to pay to utilize the Blue Card Program.

298. In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Program, also impose numerous inefficiencies and burdens on them. While the amounts paid for medical services are dictated by the Host Plan or participating plan, as explained above, the policies and coverage rules are those of the Home Plan or control plan.

299. Further, Blues will even offer commercial health insurance across state lines to healthcare providers, through national accounts or other programs, even where they will not contract with those same individuals or businesses in their capacity as a healthcare provider. For example, at various times Illinois-based Health Care Service Corporation has provided Blue-branded commercial health insurance for Tenant Healthcare, the parent company of several out-of-state healthcare providers. Because of the Association's rules, it is barred from contracting directly with the healthcare provider itself for healthcare services. This is, of course, because the arrangement allows the healthcare provider's home state to use its combined market share to extract the maximum discount possible. This sort of approach is common.

300. The national programs, including the Blue Card and National Accounts Programs, are so inefficient that Defendant and Co-Conspirator Insurance Companies have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's service area. However, Defendant and Co-Conspirator Insurance Companies use and

abuse the adjacent county rule to reinforce each other's market power, in some instances by refusing to contract with healthcare providers in an adjacent county. For example, when Highmark was attempting to force University of Pittsburgh Medical Center ("UPMC") to accept lower reimbursement rates, UPMC asked Anthem-OH to contract with Harmot Hospital, which is in a county adjacent to Ohio. Anthem-OH refused to have discussions about a contract with Harmot Hospital. This refusal was part of a horizontal agreement under which the Blues attempt to and do reinforce each other's market power.

301.   To facilitate the agreements, the Blues and the Association have established and own National Account Service Company L.L.C. ("NASCO"), which assists the Blues in processing claims involved in national accounts and other claims.

302.   Per its own marketing brochure, NASCO was formed in 1987 "through a partnership with major Blue Cross and Blue Shield Plans." It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years." NASCO establishes "work groups composed of NASCO associates and customers." NASCO also works with Blues to "ensure their compliance with [Association] mandates."

303.   Changes to the National Accounts Program, pursuant to the MDL Litigation's subscriber class settlement approved on August 9, 2022, allows certain employers with over 5,000 employees to solicit a bid from a second Blue plan, have not undermined or diminished the harmful effects of these agreements

on Plaintiff and other health care providers. Indeed, the National Accounts Program continues to limit artificially the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiff and other health care providers, thereby eliminating competition in the manner described above.

304.    To facilitate the agreements, numerous Blues and the Association have also established Consortium Health Plans, Inc. ("CHP"). CHP describes itself as a "national coalition of 20 leading BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts" whose "mission is to position Blue Cross Blue Shield as the preferred choice for national accounts." Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis. The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

305.    For example, in a marketing brochure for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level. In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest

has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-d4cb2f0a7b3f&groupId=10307, (as of Sept. 30, 2014). The brochure further explained that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

306. Another brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP. In this regard, the brochure makes the following claims:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

307. Thus, CHP harnesses claims data for the Blues in every state, metropolitan statistical area ("MSA"), and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

### 5.    PROTECTING AND INCREASING "DIFFERENTIALS"

308. Defendants and Co-Conspirators have aggressively protected and increased their differentials, which is the difference between healthcare providers'

billed charges and what the Blues paid. In August 1983, Defendants and Co-Conspirators had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of the Association to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan."

309. The second project was "Project State Watch," which included states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue system differential would be reduced by a reduction in the differential in those states. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

310. The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total

cost of care among competing health plans based on historical claims data. (Emphasis added.)

Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors. Indeed, as CHP itself says, "*[n]o other carrier even comes close.*" (Emphasis added.) And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor. According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

311.    Indeed, as demonstrated by a brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs.

312.    Despite its claims that it is simply a marketing agent, CHP acts, with the Association and the Blues, not just to measure and market discounts, but to unlawfully agree to actively suppress the amounts paid to providers in the name of "differentials." CHP regularly meets with the Association and with network contracting executives from plans to identify and develop "action plans" for "critical markets" to help with the Association's "corporate obj[ective]" of reducing provider reimbursement and increasing "discounts." CHP is an active participant in facilitating Defendant and Co-Conspirator Insurance Companies'

agreements, by actively allowing them to collaborate to reduce provider reimbursements.

313.   Despite enjoying an advantage over their competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than their competitors, even before accounting for the access fees the Blues charge as medical costs.

### 6.    DIFFERENCES BETWEEN MODERN BLUES AND OTHER INSURERS

314.   The Blues' anti-competitive agreements make them very different from other insurers. If an insurer like Humana wants to establish a provider network, its value proposition to a provider includes its ability to steer its subscribers to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat Humana's subscribers on an in-network basis.

315.   Each Blue, on the other hand, brings not only its own subscribers, but also the subscribers of every other Blue into negotiations with providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis.) And a provider who is thinking about leaving the local Blue's network knows that the consequence is not just the inability to treat the local Blue's subscribers on an in-network basis, but the inability to treat all of the Blues' subscribers on an in-network basis. Thus, the Blues are able to use leverage against providers that is unavailable to their competitors.

316.   In addition, the Blues operate less efficiently than their competitors. For example, the rules associated with the Blue Card Program, requiring compliance with each Home Plan's rules, create confusion for providers in a way that does not exist for other major insurers.

317.   Defendant and Co-Conspirator Insurance Companies' agreement that they will not contract with providers in other Blues' service areas is obviously anti-competitive. That agreement prevents the development of healthcare provider networks and competition among such networks. The agreement also prevents Blues from developing innovative and collaborative agreements with healthcare providers that would be efficient, improve quality, and lower healthcare costs. The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts. For example, Elevance, the second largest health insurer in the country, and Health Care Service Corporation, the fourth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

318.   The Blue Card Program reinforces the other agreements that Defendant and Co-Conspirator Insurance Companies have made not to compete and provides the *quid pro quo* in terms of billions of dollars in payments that are made to the Blues. The Blue Card Program is used largely in the administration of health benefit plans including for national and regional employers. Those employers pay the Blue Card access and administrative fees, and the Blues pocket

those payments. Currently, HCSC-IL is able to use its market power as the largest health insurer and administrator in Illinois to coerce healthcare providers in Illinois into participating in the Blue Card system.

### C.    THE BCBS MARKET ALLOCATION CONSPIRACY

319.    Defendant and Co-Conspirator Insurance Companies allocate the geographic markets for health insurance by restricting each Defendant or Co-Conspirator Insurance Company's activity outside of a designated geographic service area. Accordingly, these restrictions insulate each Defendant or Co-Conspirator Insurance Company from competition by other Blues in each of their respective geographic service areas. These restrictions have no economic justification other than protecting Defendant and Co-Conspirator Insurance Companies from competition.

320.    Defendant    and    Co-Conspirator    Insurance    Companies' anticompetitive practices and resulting market power permit Defendant and Co-Conspirator Insurance Companies to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendant and Co-Conspirator Insurance Companies pay in-network providers directly pursuant to provider agreements. Because of Defendant and Co-Conspirator Insurance Companies' market power and access to the more than one hundred million members of the Blues through the national programs, providers wishing to join the Blue network must accept lower

reimbursement rates. In many markets doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

321.    The vast majority of Blues refuse to honor consumer or patient assignment of benefits to providers, except when required by state law, such as in Tennessee and New Jersey. Defendant and Co-Conspirator Insurance Companies do this to discourage providers from remaining out-of-network. Defendant and Co-Conspirator Insurance Companies coerce providers who attempt to be out-of-network into network at below market rates. Defendant and Co-Conspirator Insurance Companies also retaliate against providers who attempt to operate out-of-network. Various Blues, including Louisiana Health, have told providers that if they do not remain in network, the Blue will pay the patient the reimbursement check for the provider services and the provider will then have to chase the patient while he or she rides off in a new car or fishing boat. The refusal to honor assignments creates inefficiencies for consumers and providers.

322.    Defendant and Co-Conspirator Insurance Companies undertook a coordinated effort to allocate the market in which each Defendant or Co-Conspirator Insurance Company would operate free of competition from other Blues. They did this in various ways including through a licensing scheme, requiring geographic restrictions in the exclusive trademark licenses granted to each Defendant or Co-Conspirator Insurance Company.

## 1.    RESTRICTING COMPETITION IN PENNSYLVANIA

323.   The Blues refuse to contract in an adjacent Blue's service area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem-OH's refusal to contract with a UPMC hospital in a county in Pennsylvania that borders on Ohio.

324.   UPMC has developed a number of areas of health care where it has an outstanding reputation for excellence. For example, people from across the United States have gone to UPMC for liver transplants when they could have gone anywhere in the world for the procedure. The Defendant and Co-Conspirator Insurance Companies' illegal conspiracies will mean that when the contract between UPMC and Highmark-PA terminates, other Blues including will not be permitted to enter into an in-network relationship with UPMC, and the Blues' subscribers will not have access to UPMC using in network coverage. But for the illegal conspiracies, other Blues would be able to negotiate in network relationships with UPMC.

325.   In addition, there have been other side agreements not to compete. Highmark-PA was formed from the 1996 merger of two Pennsylvania Association member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

326.   Prior to this merger, Pennsylvania Blue Shield and Independence Blue Cross, the Blue Cross licensee for the five counties of Southeastern

Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence Blue Cross rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence Blue Cross acquired in response to Keystone Health Plan East's entry into the market. In 1991, Independence Blue Cross and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and Pennsylvania Blue Shield acquired a 50-percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark-PA, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence Blue Cross. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark-PA) and Independence Blue Cross entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

327. The conduct of Highmark-PA and Independence Blue Cross demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark-PA announced that it and Independence Blue Cross intended to merge. After an exhaustive review by the Pennsylvania

Insurance Department ("PID"), Highmark-PA and Independence Blue Cross withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition . . . to the detriment of the insurance buying public."

328.    Capital presented an expert report from Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark[-PA] and [Independence Blue Cross] would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark[-PA]-[ Independence Blue Cross] will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark[-PA] and [Independence Blue Cross] would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark[-PA] has competed in the past with [Independence Blue Cross], could have been competing with [Independence Blue Cross] since 1997 but for a ten year non-compete agreement between them, and, in my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with [Independence Blue Cross] in the

future, especially given the absence of successful entry by other insurers."

- "Highmark[-PA] has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to [Independence Blue Cross] and in cooperation with [Independence Blue Cross] through a joint operating agreement to offer indemnity insurance."

- "Highmark[-PA] and [Independence Blue Cross] fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark[-PA] and [Independence Blue Cross] do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark[-PA] would have entered Southeastern Pennsylvania in competition with [Independence Blue Cross]. In fact, Highmark[-PA]'s CEO has made clear not only his desire for Highmark[-PA] to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with [Independence Blue Cross]."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Healthcare, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While healthcare services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark[-PA]'s conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by

Highmark[-PA] representatives, it appears that: (1) Highmark[-PA] seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark[-PA] will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark[-PA]'s CEO has confirmed not only that Highmark[-PA] seeks to do business in all parts of the state, but that Highmark[-PA]'s ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark[-PA]'s willingness to enter Southeastern Pennsylvania independently, but **even if Highmark[-PA] did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark[-PA] would likely induce [Independence Blue Cross] to behave more competitively in the already highly concentrated Southeastern Pennsylvania region**."

(emphasis added).

329. Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark-PA and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark-WV), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark-DE), and despite the supposed "expiration" of the non-compete agreement with Independence Blue Cross, Highmark-PA has still not attempted to enter Southeastern Pennsylvania. This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania. After the Pennsylvania regulator refused to approve the merger of Independence Blue Cross into Highmark-PA, the two entities began engaging in

more joint activity instead of competing. For example, Independence Blue Cross now pays Highmark-PA to process its provider claims. By processing those claims, Highmark-PA has access to the reimbursement rates that Independence Blue Cross uses to pay providers. In addition, Highmark-PA has been involved in similar non-competition arrangements with other Pennsylvania Blues and is now purchasing Blue Cross of Northeastern Pennsylvania.

330.   Capital has attempted to operate outside of its service area through its non-Blue branded for-profit subsidiary, Avalon. When Highmark-PA developed a dispute with the largest provider in its service area, UPMC, Capital, through Avalon, attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis. Highmark-PA objected, and the Association prohibited Capital from offering this arrangement. Highmark-PA and the Association prevented competition from Capital in the service area of Highmark-PA and Capital agreed to restrict its competition. The efforts by Capital through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's service area, Capital would be operating in the Highmark-PA service area.

## 2.    RESTRICTING COMPETITION IN OHIO

331.   The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with the Association's agreement and was seen as beneficial to consumers at the time.

332.   In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus. In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. The Association subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85- 3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

333.   In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

334.   In 1987, the Association agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical

for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

335.    Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990.

336.    Although the Association could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive service areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left the Association in 1993, leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem Blue Cross and Blue Shield.

The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. The Association refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended, as a result of the Blues' concerted conduct.

### 3. RESTRICTING COMPETITION IN MARYLAND

337. As it did in Ohio, the Association capitulated when its horizontal territorial allocation was challenged in Maryland, allowing two Blues to compete against each other statewide.

338. As of 1984, the Association had divided Maryland between two Blues. Group Hospitalization and Medical Services, Inc. ("GHMSI") operated in the Prince George's County and Montgomery County suburbs of Washington, D.C., while Blue Cross and Blue Shield of Maryland, Inc. ("BCBSM") operated in the remainder of the state.

339. The State of Maryland filed suit in the U.S. District Court for the District of Maryland against the Association, BCBSM, and GHI, alleging that their agreement to allocate territories violates Section 1 of the Sherman Act, the same allegation that Plaintiff has made in this case. *Maryland v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). The defendants moved to dismiss Maryland's suit on the grounds that their agreement to allocate territory was exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C.

§ 1012. Maryland moved for summary judgment on the same issue. During discovery, BCBSM offered testimony that its marketing department expressed interest from time to time in marketing across the boundary separating it from GHMSI's territory, but its CEO determined not to do so in part because it was prohibited by BCBSM's agreement with the Association.

340.   The court denied the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" for purposes of the McCarran Ferguson Act.

341.   Later in the case, shortly before the court was scheduled to rule on whether the case should be tried on a *per se* theory or under the rule of reason, the defendants settled the case. The Association allowed BCBSM and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991 or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

342.   As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHI's core business was profitable in 1992.

(GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBSM reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBSM both continued to exist until they merged in 1998 to become CareFirst.

### D.    IMPROPER USE OF TRADEMARKS TO RESTRICT COMPETITION FOR PROVIDERS

343.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act. The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified service areas constitute agreements to divide and allocate geographic markets, and, therefore, are *per se* violations of Section 1 of the Sherman Act.

344.    Numerous Blues and non-Blue businesses owned by Defendants and Co-Conspirators could and would compete effectively in other service areas but for the territorial restrictions. The likelihood of increased competition is demonstrated in several ways. First, as set forth above, the restrictions were specifically put in place to eliminate "Blue-on-Blue" competition. If there were no likelihood of competition, the restrictions would have been unnecessary. In fact, as set forth above, the restrictions did not initially address competition by

non-Blue businesses owned by Defendants and Co-Conspirators; however, when it became evident that such competition was an "increasing problem," the restrictions were revised to address this as well. Second, in certain portions of four states, limited competition among two Defendants and Co-Conspirators has been permitted. For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California. Likewise, Highmark-PA and Capital compete in Pennsylvania, with both operating effectively and successfully. In fact, the combined market share of Highmark-PA and Capital is comparable to the market share of many individual Blues. The Blue Cross and the Blue Shield entities also compete in Washington and Idaho without any injury to their trademarks or trade names. Obviously, these markets are far from competitive due to the agreements of the other Defendants and Co-Conspirators not to compete in these service areas. However, this competition demonstrates that competition among Blue Cross and Blue Shield licensees is not only possible but, in fact, does not undermine the Blue brand or trademark. Third, certain Blues have, in fact, expanded beyond their initial service areas by merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the Association licensee for fourteen states. Prior to its merger with WellPoint, Anthem, which was initially the Association licensee for Indiana, had expanded to become the Association licensee for eight states. Undoubtedly, absent the current restrictions, WellPoint would readily compete in additional service areas

and, in all likelihood, would compete nationally. Other Defendants and Co-Conspirators, including Health Care Service Corporation, have, in fact, recently expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this complaint. Fourth, various Defendants and Co-Conspirators have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states. For example, WellPoint has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup. WellPoint also operates Caremore Centers in Arizona despite the fact that WellPoint is not the Blue Cross Blue Shield licensee in Arizona. In addition, BCBS-MI operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services. Other Blues have likewise expanded into other service areas in a similar manner. Of course, these expansions are currently extremely limited by the restrictions on competition. While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for provision of healthcare services.

345. Absent competition, the Blues have achieved significant market power and domination in the markets in their service areas. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for payment of healthcare providers.

346.    The Association is tasked with policing compliance with Defendants' and Co-Conspirators' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a nember's license and membership are terminated, it loses the use of the Blue brands, which the Association admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to the Association. According to WellPoint's February 17, 2011 Form 10-K, there was a "re establishment fee" of $98.33 per enrollee.

347.    In terms of their contracting and reimbursement practices with respect to healthcare providers, there is no danger of consumer confusion that would justify any territorial exclusions for the Blues.

### E.    THE BCBS PRICE FIXING AND BOYCOTT CONSPIRACY

348.    As a result of the market allocation conspiracy, Defendant and Co-Conspirator Insurance Companies achieved market dominance and low pricing for healthcare provider services in each service area. Defendant and Co-Conspirator Insurance Companies therefore have reached a horizontal agreement and implemented a price fixing and boycott conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each service area to benefit all Blues. The horizontal conspiracy also involves a concerted refusal to deal or collective boycott of healthcare providers outside of

each Defendant Blue's service area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the members. Those national programs include: A. Transfer Program; B. Inter-Plan Teleprocessing System ("ITS"); C. Blue Card Program; D. National Accounts Programs; E. National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and E. Inter-Plan Medicare Advantage Program.

349.   As part of their agreement to participate in the National Accounts Programs, the Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their service areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their service areas.

350.   Defendants and Co-Conspirators achieved the price fixing and boycott conspiracy by agreeing that all Defendant and Co-Conspirator Insurance Companies would participate in the national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant or Co-Conspirator Insurance Company receives healthcare services within the service area of another Blue. The Blue Card Program most commonly applies when employees reside in a different service area than the headquarters of their employer. The Blue Card and National Accounts Programs are also used to process claims for medical services for Blue members while traveling. Plaintiff regularly treat patients who are insured by a

Defendant or Co-Conspirator Insurance Company or who are included in an employee benefit plan administered by a Defendant or Co-Conspirator Insurance Company outside the service area where the medical treatment is rendered.

351.  The  Defendant  and  Co-Conspirator  Insurance  Companies implement the conspiracy collectively through the IPPC, where a number of the Defendant and Co-Conspirator Insurance Companies decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

352.  Each of the Defendant and Co-Conspirator Insurance Companies either has market power or exclusive access to an element essential to effective competition. Through the national programs, the Defendant and Co-Conspirator Insurance Companies control more than one hundred million patients, something no other health insurance company has access to. These more than one hundred million patients provide the Defendant and Co-Conspirator Insurance Companies a substitute for market power when Defendant and Co-Conspirator Insurance Companies are dealing with providers. In fact, in many places, providers treat more patients through the national programs than through the direct subscribers of the local Defendant or Co-Conspirator Insurance Company. One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of BCBS-NC. When BCBS-NC demands below market rates from the subscribers in central North

Carolina, it uses the many patients in the national programs to insist that the rates remain below competitive market rates.

353.   The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant and Co-Conspirator Insurance Companies directly for their subscribers, those Blues, including Aware, paid for those services at the rates that it normally pays, which are higher than the rates paid by BCBS-AL. When BCBS-AL learned of those payments, it then recouped the difference between those higher rates and the BCBS-AL rates from payments due for services for BCBS-AL subscribers. Based on information and belief, Plaintiff alleges that BCBS-AL and the other Blues divided the funds recouped under the procedures established by the Defendant and Co-Conspirator Insurance Companies on the IPPC. Also based on information and belief, Plaintiff alleges that in making the recoupments, BCBS-AL was following the procedures established by the Defendant and Co-Conspirator Insurance Companies through the IPPC to enforce the price fixing conspiracy.

354.   When one Blue has a contract dispute or issue with a healthcare provider, the other Blues, as independent horizontal parties and as horizontal parties through the Association, act to reinforce the market power of each of the Blues. For example, when Highmark refused to pay UPMC reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC wrote to Blues throughout the country, requesting that they separately contract with

UPMC. Certain Blues responded directly and refused to negotiate. At the same time, the Association coordinated responses for a number of other Blues, and communicated the refusal to negotiate for those other Blues. Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Blues in other states but have received refusals from those Blues, while BCBS-NC continues to reimburse at sub-competitive rates.

355. Within the Blue Card Program, the Blue through which the subscriber is enrolled is the Home Plan, while the Blue located in the service area where the medical service is provided is the Host Plan. The website of CareFirst describes Blue Card in the following manner:

**Key terms**

Host Plan
Also called the local plan, where the actual medical service is provided; CareFirst is the Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services from a CareFirst provider

Home Plan
The contracted BlueCross BlueShield Plan where the insured member is enrolled; The logo of the Home plan can be found on the member's BCBS insurance card.

Out-of-Area-Insured
An insured individual who is enrolled in a Blue Cross and Blue Shield other than CareFirst.

**Example**

When you see an out-of-area insured patient like Julie Gilbert, submit your claims to CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through the BlueCard program.


As the Host Plan, CareFirst receives your claim, codes and prices it according to contracted provider agreements, then sends an electronic submission to Julie's Seattle-based Home Plan.

When the Seattle-based Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.

CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim was paid.

356.    Under the National Accounts Program, a Blue may administer a national or multi-state employee benefit plan. In that instance, the Blue is the control plan, while the other Defendant and Co-Conspirator Insurance Companies are participating plans. The Defendant and Co-Conspirator Insurance Companies divide the proceeds either through the Blue Card Program or through separate agreements they have entered into.

357.    To carry out the business of the conspiracies, the Defendant and Co-Conspirator Insurance Companies that are partners, along with the Association, have established and own NASCO through which many of the Blues acting in concert process claims involved in National Accounts and other claims. NASCO is a party to the conspiracies and exists to implement them.

358.    NASCO not only provides a forum for the conspiracies but also ensures that the agreements reached in the conspiracies are implemented.

359.    In further support of the conspiracies, numerous Blues and the Association established CHP. Through CHP, the Blues share claims data

reflecting provider reimbursements on a nationwide basis. The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

360.   As a result of the price fixing and boycott conspiracy, a healthcare provider treating a patient who is enrolled in a Blue in another service area is not permitted to negotiate a separate agreement with that Defendant or Co-Conspirator Insurance Company. Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has achieved as a result of the market allocation conspiracy. For example, many members of plans insured or administered by Anthem-Empire, HCSC-IL, and BCBS-MI spend time in Florida during the winter months. Rather than being permitted to negotiate prices with these Defendant and Co-Conspirator Insurance Companies, however, healthcare providers in Florida must accept the prices paid by Guidewell. Moreover, the Blues do not allow health care providers to have an escape clause to allow them to opt out of the national programs and contract separately with Blues.

361.   Accordingly, Defendant or Co-Conspirator Insurance Company have agreed to fix the prices for healthcare reimbursement within each service area. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another service area, including Plaintiff, receive significantly lower reimbursement than they would receive absent Defendant and Co-Conspirator Insurance Companies' agreement

to fix prices. The price fixing conspiracy is a *per se* violation of Section 1 of the Sherman Act. It is also a violation under a quick look or rule of reason analysis.

362.    In addition to lowering payments for providers, the national programs including the Blue Card Program, the National Accounts Program also impose numerous inefficiencies and burdens on them. While the rates paid for medical services are dictated by the Host Plan or participating plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home Plan or control plan. The Home Plan or control plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's service area. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a plan will pay for services provided to one of its members. For example, BCBS-TN administers the Nissan Employee Benefit Plan, which covers the many Nissan employees who reside in Mississippi and, accordingly, seek medical treatment there. For these patients, BCBS-TN is the Home Plan or control plan, while BCBS-MS is the Host Plan or participating plan. BCBS-MS determines the price paid for services rendered by a healthcare provider in Mississippi. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BCBS-TN. While the Mississippi provider has access to the rules for preauthorization or pre-notification for BCBS-MS because BCBS-TN boycotts the Mississippi providers from participating in its network as a part of its horizontal agreement with all the Blues, and the

provider does not have ready access to BCBS-TN's rules. In this example, the Mississippi healthcare provider can and does innocently fail to comply with the rules of BCBS-TN and be paid nothing by BCBS-TN, not even receiving the discounted amount that would result from the price fixing conspiracy. When this happens, the healthcare provider has no recourse. Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home Plan or control plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's service area.

363.   Many Blues have different medical records requirements and timing for those requirements that apply to providers including hospitals. Hospitals find their bills being reduced or denied because they comply with the Host Plan or participating Blue's requirements (those where the hospital is located and where the hospital is in network) but not with the control or home Blue's requirements. Since the hospitals are not in network with the control or home Blue, those hospitals do not have ready access to those medical records requirements. In an effort to address this highly inefficient process, hospitals in Florida, where there are many Blue Card and National Accounts subscribers, set up weekly telephone

calls with Blues to try to learn the requirements of each of the plans as described above.

364. The national programs including the Blue Card and National Accounts Programs are so inefficient that the Defendant and Co-Conspirator Insurance Companies have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's service area. However, the Defendant and Co-Conspirator Insurance Companies use and abuse the adjacent county rule to reinforce each other's market power, as discussed in the Harmot Hospital example above.

365. As a result of their price fixing and boycott conspiracy, Defendant and Co-Conspirator Insurance Companies reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiff.

## F. OTHER ABUSES THAT PRESERVE THE BLUES' ENHANCED MARKET POWER

366. In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendant and Co-Conspirator Insurance Companies' abuse of the significant market power that has resulted from their conspiracy.

367. For example, a number of the Blues use most-favored nations ("MFNs") with hospitals and other facilities. According to at least some defense

counsel, BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues. The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract.

368.   All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996). By preventing the full disclosure of price terms of the contracts, Defendant and Co-Conspirator Insurance Companies undermine competition.

369.   In addition, Defendant and Co-Conspirator Insurance Companies, require Plaintiff to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants and Co-Conspirators refuse to disclose the rates that they pay to other providers. Defendant and Co-Conspirator Insurance Companies thereby create asymmetric information in the market for the purchase of healthcare provider services, preventing the market from functioning competitively and giving Defendant and Co-Conspirator Insurance Companies an advantage in any bargaining that occurs between Defendant and Co-Conspirator Insurance Companies and providers.

370.  Finally, Defendant and Co-Conspirator Insurance Companies, specifically Highmark, have threatened to utilize their extraordinary and excessive "reserves" (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below market rates offered in a market free from competition from other Blues. All of this is undertaken in an attempt to further drive down payment rates to providers and to raise barriers for competing firms to enter these markets.

### G.    ANTITRUST INJURY

371.  Defendant and Co-Conspirator Insurance Companies' illegal activities have resulted in antitrust injury and harm to competition.

372.  Through their violations of the antitrust laws, Defendant and Co-Conspirator Insurance Companies have agreed that they will not compete with each other. The effect is to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, causing increased market concentration and reduced competition throughout the country.

373.  By definition, Defendant and Co-Conspirator Insurance Companies have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' services areas. For instance, competition in the state of Pennsylvania has been and continues to be harmed in that other Blues agree not to enter the Pennsylvania market to compete with

Capital, Highmark-PA, and Independence Blue Cross no matter the circumstances.

374. The Defendant and Co-Conspirator Insurance Companies have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets. The Defendant and Co-Conspirator Insurance Companies suppressed prices for provider goods, services and facilities and have injured competition depriving patients of choices in the marketplace for healthcare providers.

375. Additionally, because most of the Blues are monopolists in the health care financing and health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower payment rates necessarily lower consumers' premiums. R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

376.   In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than competitive prices the Blues pay. A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians. "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," availa*ble at* http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2 012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years). Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendant and Co-Conspirator Insurance Companies. Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments. Hospitals and other facilities are closing. Other facilities are reducing services offered to consumers. Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

377.   In the end, economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

378.   In addition, Plaintiff suffers because agreements not to compete also restrict its choices in the market. Because the other Blues agree not to compete in other service areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' service area. This has the effect of depressing the payment rates in the market for in- and out-of-network services.

379.   During the class period including after 2010, the Blues implemented new fee schedules for providers, generally on an annual basis. Those new fee schedules are lower than they would have been without the Defendant and Co-Conspirator Insurance Companies' anticompetitive conduct. The new fee schedules have created new antitrust injuries and damages for the health care providers.

380.   Defendant and Co-Conspirator Insurance Companies' illegal activities have resulted in harm to competition. Moreover, Defendant and Co-Conspirator Insurance Companies' activities have been undertaken with the aim of forcing Plaintiff to choose between non-competitive rates or being put out of business through coercion.

381.   Defendant and Co-Conspirator Insurance Companies' illegal activities have also resulted in antitrust injury to Plaintiff, including lost revenues resulting from decreased use of Plaintiff's services and facilities and in threatened future harm to Plaintiff's business and property.

## H. DEFENDANTS AND CO-CONSPIRATORS, EVEN THOSE ORGANIZED AS NOT FOR PROFIT, ENJOY SUPRA-COMPETITIVE PROFIT

382. Defendant and Co-Conspirator Insurance Companies' anticompetitive practices have resulted in their collection of supra-competitive profits. Absent competition, Defendant and Co-Conspirator Insurance Companies have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendant and Co-Conspirator Insurance Companies could have realized in a competitive marketplace. As BCBS-MI has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supra-competitive profits include high underwriting margins and surpluses well above statutory requirements.

383. Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' and Co-Conspirators' tax-exempt status, the Blues formed for-profit subsidiaries as described above.

384. The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

385.   Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendant and Co-Conspirator Insurance Companies are often accountable to no one other than their officers.

386.   Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks. These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

387.   Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

388.   By way of example, the below are some of Defendant and Co-Conspirator Insurance Companies' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

389.    The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendant and Co-Conspirator Insurance Companies to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

390.    For instance, Defendant and Co-Conspirator Insurance Companies often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. BCBS-MI was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

391.    In addition, despite claiming to be "not-for-profit," many of these Blues hold massive "reserves" built off the net income spread between the high

premiums they charge customers and the below market rates they pay to providers. Those excessive reserves have resulted in higher costs to consumers.

392.   As of Sept. 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the Association.

393.   Many of the Blues undersell their actual reserves substantially by citing only the surplus from the mainline company, but not the general reserves on the companies' combined reporting statements, which accounts for all lines of business.

394.   In South Carolina, for instance, BCBS-SC's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance.

395.   Members of the Board of BCBS-SC "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." They were required to do little but show up to the occasional meeting.

396.   This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies. BlueCross BCBS-SC paid executives in the millions of dollars in 2010.

397.   Health Care Service Corporation, a conglomerate of several Blues, including HCSC-IL, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.

This net income does not even account for large blocks of plans it merely administers for the self-insured. "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus. The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011." "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012." *See* http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceoscompensation-rockets-past-16-million.

398.   Such salaries result in higher costs to consumers. These supra-competitive profits are built on the strength of Defendant and Co-Conspirator Insurance Companies' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force providers to join their networks at below-market rates. A spokeswoman for BCBS-SC noted that the outrageous increases are priced "to reflect its superior networks." Thus, the market power of the Blues allows them to pay below market rates to providers. This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

399.   The statutes of limitation as to Defendant and Co-Conspirator Insurance Companies' continuing antitrust violations alleged in this Complaint

were tolled by the pendency of one or more class action complaints and any amendments thereto, against Defendant and Co-Conspirator Insurance Companies for the alleged anticompetitive conduct alleged in this Complaint.

## VIII.  VIOLATIONS ALLEGED

### Count One
#### (Per Se Violations of §§ 1 and 3 of the Sherman Act)
#### (Asserted Against All Defendants)

400.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

401.    The License Agreements, Membership Standards, and Guidelines agreed to by the individual Defendant and Co-Conspirator Insurance Companies and the Association represent horizontal agreements entered into by and between the individual Defendant and Co-Conspirator Insurance Companies, all of whom are actual competitors or potential competitors in the market for the pricing and reimbursement of healthcare services.

402.    Each of the License Agreements, Membership Standards, and Guidelines entered into between the Association and the individual Defendant and Co-Conspirator Insurance Companies represents a contract, combination, and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

403.    Through the License Agreements, Membership Standards, and Guidelines, the Association and the individual Defendant and Co-Conspirator Insurance Companies have combined, conspired, and agreed to limit price term negotiations and to allocate providers and geographic markets for the pricing and reimbursement of healthcare services. In particular, the Defendants and Co-

Conspirators have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) allocate geographic territories or customers among Defendant and Co-Conspirator Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names; (2) adhere to the National Best Efforts Rule, which directly restricts the non-Blue output that each Defendant or Co-Conspirator Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly restricts the non-Blue output that each Defendant or Co-Conspirator Insurance Company can offer within its designated exclusive territory.

404.   Each of the horizontal agreements identified in this Complaint is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of §§ 1 and 3 of the Sherman Act.

405.   As a direct and proximate result of the individual Defendant and Co-Conspirator Insurance Companies and the Association's continuing violations of §§ 1 and 3 of the Sherman Act described above, Plaintiff has suffered antitrust injury in that they have been paid lower than competitive rates for rendered healthcare services. Each payment from Defendants and Co-Conspirators has caused injury to Plaintiff.

406.   The Defendant and Co-Conspirator Insurance Companies and the Association are jointly and severally liable to the Plaintiff in treble the amount of

the actual damages suffered by the Plaintiff plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).

### Count Two
(Rule of Reason Violations of §§ 1 and 3 of the Sherman Act)
(Asserted Against All Defendants)

407.    Plaintiff repeats and realleges the allegations in all Paragraphs above.

408.    The Defendant and Co-Conspirator Insurance Companies have market power, i.e., the power to lower the price paid to providers for healthcare services below the competitive level, in the payment of U.S. healthcare services to healthcare providers, the relevant geographic and product market alleged herein, i.e. the healthcare pricing and reimbursement market.

409.    The License Agreements, Membership Standards, and Guidelines agreed to by and among the Defendant and Co-Conspirator Insurance Companies represent horizontal agreements entered into between and among the individual Defendant and Co-Conspirator Insurance Companies, all of whom are competitors or potential competitors in the market for pricing and reimbursement of healthcare services in the United States.

410.    Each of the License Agreements, Membership Standards, and Guidelines entered into between the Association and the Defendant and Co-Conspirator Insurance Companies represents a contract, combination and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

411. Through the License Agreements, Membership Standards, and Guidelines, the Association and the Defendant and Co-Conspirator Insurance Companies have agreed to and have, in fact, restricted price term negotiations and allocated providers, including the Plaintiff, who provide healthcare services. By so doing, Defendant and Co-Conspirator Insurance Companies and the Association have unreasonably injured competition in the relevant market for negotiating prices and reimbursing healthcare services within the United States. In particular, the Defendants' and Co-Conspirators' allocation of geographic areas and/or providers and the output restrictions the Defendants and Co-Conspirators have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly decreased below the competitive level the price paid by Defendant and Co-Conspirator Insurance Companies to Plaintiff for healthcare service in the United States. These output restriction agreements and market allocation agreements unreasonably injure competition within the meaning of §§ 1 and 3 of the Sherman Act.

412. The output restrictions and market allocation agreements entered into among the individual Defendant and Co-Conspirator Insurance Companies (executed through the Association License Agreements and related Membership Standards and Guidelines) are not only *per se* illegal, but they are also unreasonably anticompetitive and violate the Rule of Reason.

413.   Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

a.   Allowing the Defendant and Co-Conspirator Insurance Companies to artificially and unreasonably lower the prices paid to healthcare providers substantially below the competitive level;

b.   Substantially restricting output, especially with respect to non-Blue branded plans and competition; and

c.   Depriving the Plaintiff and others of the benefits of free and open competition, including a greater provider choice, greater market entry, higher prices, and higher quality services.

414.   The challenged anticompetitive agreements do not provide any procompetitive benefits. Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Defendant and Co-Conspirator Insurance Companies to negotiate and contract with healthcare providers under a Blue mark or name.

415.   In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein are clearly and substantially outweighed by the anticompetitive effects detailed above. Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures. The output restrictions and

market allocation agreements in the License Agreements, Membership Standards, and Guidelines therefore are not only *per se* illegal, as set forth in Count I above, but also unreasonably restrain trade in violation of the Rule of Reason. The combination of agreements to restrict output, allocate markets, and restrain trade adversely affects Plaintiff by depriving it, among other things, of the opportunity to contract with Defendant and Co-Conspirator Insurance Companies for higher service prices set by a free market unencumbered by Defendants' and Co-Conspirators' anti-competitive agreements. As a result of the Defendants' and Co-Conspirators' market allocation agreement, National Best Efforts Rule and Local Best Efforts Rule the Defendant and Co-Conspirator Insurance Companies have not competed against each other healthcare providers and have been precluded by such agreement and restraints from doing so.

416. Likewise, the Defendant and Co-Conspirator Insurance Companies have been precluded from competing for healthcare providers both inside and outside of their respective Exclusive Service Area under non-Blue brands. This has prevented entry of Defendant and Co-Conspirator Insurance Companies into the market for healthcare provider services, and lowered the prices paid for such services substantially below what they would have been but for the illegal restraints.

417. As a direct and proximate result of the Defendants' and Co-Conspirators' continuing violations of §§ 1 and 3 of the Sherman Act described in this Complaint, Plaintiff has suffered antitrust injury and damages in an amount

to be proven at trial. These damages consist of having been paid artificially deflated, unreasonable, and/or non-competitive and lower prices for healthcare services to Plaintiff providers than they would have but for the Defendants and Co-Conspirators unlawful, anticompetitive agreements. These damages have accrued anew each time Plaintiff has been paid such prices and have been denied the benefits of competition for their healthcare services.

418.    The Defendant and Co-Conspirator Insurance Companies and the Association are jointly and severally liable to the Plaintiff in treble the amount of the actual damages suffered by the Plaintiff plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).

## IX.    RELIEF REQUESTED

WHEREFORE, Plaintiff request that this Court:

a.    Hold the Defendants to be jointly and severally liable to the Plaintiff and award Plaintiff treble the amount of the damages they have sustained;

b.    Award Plaintiff pre- and post-judgment interest;

c.    Award Plaintiff its costs and attorneys' fees;

d.    Permanently enjoin Defendants from all conduct that constitutes violations of Section 1 of the Sherman Act and the state antitrust laws identified herein, including Defendants' agreements and conduct comprising and in furtherance of the Blue Conspiracies, such as entering into or continuing agreements that unlawfully restrict geographic competition, reduce output, fix prices, or otherwise harm competition for the purchase of health care goods, services, and facilities, enforcing MFN provisions, or enforcing restrictions on assignments of benefits and directions of payment, to include Defendants utilization of the Blue Card Program to pay

Plaintiffs and development any other program or structure that is intended to or has the effect of fixing prices paid to Plaintiffs;

e.    Permanently enjoin Defendants from retaliating against any Plaintiff for participation in this action or the enforcement of any remedy or judgment;

f.    Enjoin Defendants in the same manner and to the same extent Defendants have stipulated to being enjoined in any other action with respect to the conduct alleged herein;

g.    Award Plaintiff such equitable and injunctive relief necessary to prevent future loss or harm;

h.    Adjudge and decree that the Association and Defendant and Co-Conspirator Insurance Companies have violated §§ 1 and 3 of the Sherman Act;

i.    Impose on all Defendants on-going periodic reporting on compliance obligations, including monitoring by the Court or a Court-appointed special master;

j.    Disgorgement of Defendants' unlawfully obtained profits obtained pursuant to Defendants' anticompetitive conduct;

k.    Adjudge and decree that the Association has used or is using the Blue Shield trademarks and the Blue Cross trademarks to violate the antitrust laws of the United States; and

l.    Award any such other and further relief as may be just and proper.

This 26th day of March, 2025.    Respectfully submitted,

/s/ Brian J. Bluth

Brian J. Bluth
McCORMICK LAW FIRM
835 West Fourth Street
Williamsport, PA 17701
Tel: (570) 326-5131
bbluth@mcclaw.com

-and-

Joseph Ostoyich, *pro hac vice forthcoming*
William Lavery, *pro hac vice forthcoming*
Jordan Passmore, *pro hac vice forthcoming*
Sung Shin, *pro hac vice forthcoming*
CLIFFORD CHANCE US LLP
2001 K Street NW
Washington, DC 20006
Tel: (202) 912-5000
joseph.ostoyich@cliffordchance.com
william.lavery@cliffordchance.com
jordan.passmore@cliffordchance.com
sung.shin@cliffordchance.com

*Attorneys for Mount Nittany Health System*